## Commonwealth *vs.* Brandon M. Clarke.

Suffolk. September 7, 2011. - January 13, 2012.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Practice, Criminal,* Admissions and confessions, Waiver, Voluntariness of statement. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Voluntariness of statement. *Evidence,* Admissions and confessions, Voluntariness of statement. *Waiver.*

This court concluded that the record of a criminal case supported a motion judge's determination that a criminal defendant's nonverbal expressive conduct (i.e., shaking his head from side to side) sufficed to unambiguously invoke the defendant's constitutional right to remain silent as a matter of Federal law [341-344]; therefore, where the police, by failing to immediately cease questioning, to pause the interrogation, or to limit the scope of the later interrogation, failed to scrupulously honor the defendant's invocation of his right to remain silent, suppression of the defendant's subsequent incriminating statements was warranted [344-345].

This court declined to adopt, as a matter of State law, the Federal standard requiring that a criminal defendant, in the absence of a prior waiver of Miranda rights, invoke his or her constitutional right to remain silent with the utmost clarity. [345-353]

Complaint received and sworn to in the Dorchester Division of the Boston Municipal Court Department on October 14, 2008.

A pretrial motion to suppress evidence was heard by *James W. Coffey*, J.

An application for leave to file an interlocutory appeal was allowed by *Gants*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him.

*Teresa K. Anderson*, Assistant District Attorney, for the Commonwealth.

*Rebecca A. Jacobstein (Anne Coolidge Masse* with her) for the defendant.

Lenk, J. While being held for custodial interrogation, and without having first waived the Miranda rights of which he had

been advised, the defendant shook his head from side to side in response to the question, "So you don't want to speak?" The police then posed further questions and, after a time, the defendant made incriminating statements. A judge in the Dorchester Division of the Boston Municipal Court Department allowed the defendant's motion to suppress those statements. A single justice of this court allowed the Commonwealth's application for leave to appeal from the allowance of the motion to suppress, Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996), and reported the case to the full court. The question for decision is whether the defendant, by his conduct, had invoked the right to remain silent guaranteed under the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights and, if so, whether the police sufficiently honored that right. We conclude that, under both the Fifth Amendment and art. 12, the right to remain silent was invoked but was not "scrupulously honored," and that suppression of the subsequent incriminating statements was accordingly warranted. *Commonwealth* v. *Jackson*, 377 Mass. 319, 326 (1979), quoting *Michigan* v. *Mosley*, 423 U.S. 96, 104 (1975). In so concluding, we hold that, in the prewaiver context, art. 12 does not require a suspect to invoke his right to remain silent with the utmost clarity, as required under Federal law. See *Berghuis* v. *Thompkins*, 130 S. Ct. 2250, 2263 (2010).

1. *Background and prior proceedings.* On October 10, 2008, Detectives Christopher Ahlborg and Audrina Lyles of the Massachusetts Bay Transportation Authority (MBTA) transit police arrested the defendant for an indecent assault and battery that had occurred at a subway station several weeks earlier on September 16, 2008. After the arrest, Ahlborg and Lyles placed the defendant in an interrogation room at MBTA headquarters. The detectives informed the defendant that their conversation would be video recorded.[1]

At the outset of the interrogation, Ahlborg provided the defendant with a waiver form, which described the defendant's rights

---

[1]We have reviewed the video recording of the portion of the interrogation forming the basis of this appeal.

under *Miranda* v. *Arizona*, 384 U.S. 436 (1966) (*Miranda*).[2] On being given the Miranda waiver form, the defendant immediately began to sign it. Ahlborg stopped the defendant, informing him that he first wanted to review with him verbally the rights described in the form before obtaining the defendant's written waiver of those rights. After reviewing those rights with the defendant, Ahlborg asked him whether he wanted to discuss the charges. The following exchange ensued:

THE DEFENDANT:　"[Inaudible] speak with you, or?"

AHLBORG:　　　　"Nope, you don't have to speak with me at all if you don't want to. It's completely up to you."

THE DEFENDANT:　"What happens if I don't speak with you?"

AHLBORG:　　　　"Nothing."

THE DEFENDANT:　"I just want to go home."

AHLBORG:　　　　"You just want to go home? So you don't want to speak?"

At this point in the interrogation, as found by the motion judge, the defendant "shook his head back and forth in a negative fashion." Ahlborg responded to this head motion by saying, "Okay." During the motion hearing, Ahlborg testified that he interpreted the defendant's head motion to mean that "he didn't want to speak."

Lyles, however, stated that she "really didn't interpret that headshake at the time," although she did characterize the motion as a "headshake." Instead, she began to correct a misap-

[2]*Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966) (*Miranda*), requires that "[p]rior to any questioning, the [suspect] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." The Miranda waiver form used here set forth each of these rights and also indicated that if the suspect decided to answer questions he could stop at any time. The form then inquired whether the suspect understood each of the rights read to him and concluded with the question, immediately above the signature line, "Having these rights in mind, do you wish to speak with me now?" The form did not expressly inquire whether the suspect waived his rights.

prehension that she thought had resulted from the earlier exchange. When Ahlborg told the defendant "nothing" would happen to him if he did not speak to the detectives, Lyles thought the defendant understood that statement to indicate that he would be free to leave. So she continued:

LYLES:  "But that 'nothing' does not exclude you still being charged and us detaining you here. You'll either be bailed, or you'll have to go to court in the morning to answer to what you're being charged with. So it doesn't mean you'll get to walk up out of here and go home right now."[3]

In the subsequent portion of the interrogation, the defendant made a number of statements indicating his confusion. He at different times stated, "I don't know what's going on. I'm really lost about what's going on"; "I just wanna know what's going on"; and "I'm just really scared." The defendant also cried at various points during the interrogation. After further discussion between the detectives and the defendant, the following exchange occurred:

LYLES:  "Well we can't talk to you about anything until you make a decision."

THE DEFENDANT:  "Like yeah, I want to talk about it, but I'm just not sure what it is about."

AHLBORG:  "Ok, so you want to talk to us?"

THE DEFENDANT:  "Yeah."

AHLBORG:  "You do. Ok. If you want to talk to us, sign the paper and indicate that you do want to talk to us."

[3]Lyles did not reiterate that the defendant would not suffer any negative consequences from refusing to speak. This was presumably what Ahlborg intended by his earlier response that "nothing" would happen if the defendant chose not to speak. As is well established, a defendant cannot be penalized for invoking his right to remain silent. See *Commonwealth* v. *Peixoto*, 430 Mass. 654, 657 (2000) ("Miranda warnings contain an implicit assurance that a defendant's silence after such warnings will carry no penalty"). See also *Doyle* v. *Ohio*, 426 U.S. 610, 618 (1976).

The defendant then signed and dated the Miranda waiver form, but did not grant the detectives permission to record the remainder of the interrogation. During this unrecorded portion of the interrogation, the defendant admitted that he had repeatedly brushed his hand against a man on the subway car.

The defendant was charged with one count of assault and battery in violation of G. L. c. 265, § 13A, and two counts of indecent assault and battery on a person fourteen or over in violation of G. L. c. 265, § 13H. He moved to suppress the incriminating statements made during the interrogation, arguing that he had invoked his right to remain silent by shaking his head in a negative fashion at the outset of the interview.

After an evidentiary hearing at which Ahlborg and Lyles both testified, a Boston Municipal Court judge allowed the motion to suppress. In doing so, the judge held that the defendant had unambiguously invoked his right to remain silent. The judge found that the defendant "shook his head back and forth in a negative fashion" in response to the question, "You don't want to speak with us?" The judge based his decision also on the defendant's over-all reluctance to speak with the detectives, as demonstrated by questions such as, "Do I have to speak with you?" and, "What will happen if I don't speak to you?" In examining the totality of the circumstances of the interrogation, including that the defendant was a "young man in his early twenties" with no prior arrests, the judge concluded that it was "clear that [the defendant] invoked his right to remain silent."

2. *Standard of review.* In general, "[i]n reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott,* 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez,* 438 Mass. 213, 218 (2002). "[O]ur duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Bostock,* 450 Mass. 616, 619 (2008), quoting *Commonwealth* v. *Mercado,* 422 Mass. 367, 369 (1996).

Where the motion judge's findings of fact are premised on documentary evidence, however, the case for deference to the trial judge's findings of fact is weakened.

"A judge who has seen and heard the witnesses is in a better position to determine their credibility than is a court which is confined to the printed record. The situation is different in regard to findings made upon written evidence. In that respect this court stands in the same position as did the trial judge, and reaches its own conclusion unaffected by the findings made by the trial judge."

*Commonwealth* v. *Novo*, 442 Mass. 262, 266 (2004), quoting *Berry* v. *Kyes*, 304 Mass. 56, 57 (1939). This logic extends to videotape evidence. Here, to the extent that the judge based his legal conclusions on facts found by virtue of a video recording, "we are in the same position as the [motion] judge in viewing the videotape." *Commonwealth* v. *Prater*, 420 Mass. 569, 578 n.7 (1995). In such circumstances, we have consistently taken "an independent view" of the evidence and analyzed its significance without deference. See *Commonwealth* v. *Bean*, 435 Mass. 708, 714 n.15 (2002).

The motion judge did, however, consider the videotape in light of the detectives' testimony. To the extent the motion judge made credibility determinations relevant to his subsidiary findings of fact, we adhere to the normal standard of review. See *Commonwealth* v. *Novo*, *supra* at 266 n.3. We afford such findings "substantial deference," *Commonwealth* v. *Tavares*, 385 Mass. 140, 145, cert. denied, 457 U.S. 1137 (1982), quoting *Commonwealth* v. *Tabor*, 376 Mass. 811, 822 (1978), and accept them "unless not warranted by the evidence." *Commonwealth* v. *Raymond*, 424 Mass. 382, 395 (1997).

3. *Discussion.* a. *Fifth Amendment.* The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." In *Miranda, supra,* the United States Supreme Court held that this privilege against self-incrimination extends to State custodial interrogations; the Court reasoned that without proper safeguards, "the possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated." *United States* v. *Patane*, 542 U.S. 630, 639 (2004). As a result, in circumstances of custodial interrogation,[4] *Miranda*

---

[4]There is no dispute here that the defendant was subject to custodial inter-

requires that the defendant "be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda, supra* at 479. Unless the government can prove voluntary, knowing, and intelligent waiver of these rights after such warnings are given, any statements made by the suspect are inadmissible. See *Commonwealth* v. *Simon,* 456 Mass. 280, 286-287 (2010). Although waiver and invocation of the rights described in the Miranda warning are "entirely distinct inquiries," *Smith* v. *Illinois,* 469 U.S. 91, 98 (1984), there is an important relationship between the two insofar as "[a]ny waiver, express or implied, may be contradicted by an invocation at any time." *Berghuis* v. *Thompkins,* 130 S. Ct. 2250, 2263 (2010) (*Thompkins*).

"[R]esponsibility for invoking the protections guaranteed by [*Miranda*] and art. 12 rests squarely in the hands of criminal defendants." *Commonwealth* v. *Collins,* 440 Mass. 475, 479 n.3 (2003), quoting *Commonwealth* v. *Beland,* 436 Mass. 273, 288 (2002). The United States Supreme Court's decision in *Miranda* set a low bar for invocation of the right to remain silent: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda, supra* at 473-474. More recently, however, the Court has held that, under the Federal Constitution, in order for criminal defendants to invoke their right to remain silent, whether before or after waiving their Miranda rights, they must "unambiguously" announce their desire to be silent. *Thompkins, supra* at 2260. This test is an objective one, requiring "that a reasonable police officer in the circumstances would understand the statement" to be an invocation of the Miranda right. *Davis* v. *United States,* 512 U.S. 452, 459 (1994) (*Davis*). In *Thompkins,* the defendant's two hours and forty-five minutes of near-total prewaiver silence was insufficient to meet this heightened requirement of "unambiguous" invocation. *Thompkins, supra* at 2258-2260.

rogation, as he was subject to "questioning initiated by law enforcement officers after [being] taken into custody." *Miranda, supra* at 444.

On sufficiently clear invocation, the right to remain silent must be "scrupulously honored." *Michigan* v. *Mosley*, 423 U.S. 96, 104 (1975) (*Mosley*). See *Commonwealth* v. *Brant*, 380 Mass. 876, 882, cert. denied, 449 U.S. 1004 (1980). The right to remain silent described in *Miranda* includes "not only the right to remain silent from the beginning [of questioning] but also a continuing right to cut off, at any time, any questioning that does take place." *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 265 (1982). Absent such "scrupulous" protection of the right to remain silent, statements made after invocation of the right are inadmissible in the prosecution's case-in-chief. See *Harris* v. *New York*, 401 U.S. 222, 224-226 (1971).

Here, the record supports the motion judge's determination that the defendant met the heightened *Thompkins* standard and invoked his right to remain silent as a matter of Federal law. In response to a direct question — "So you don't want to speak?" — the motion judge found, reasonably, that the defendant shook his head, indicating a negative response. Ahlborg's question was not investigatory in nature but, instead, directly concerned the defendant's desire to invoke his Miranda rights; Ahlborg himself understood the gesture to mean that the defendant did not want to speak. Unlike in *Thompkins, supra* at 2258, where the defendant sat in silence for almost three hours, the defendant here engaged in affirmative conduct indicating his desire to end police questioning.

Relying on *Thompkins*, the Commonwealth argues that the defendant must actually speak to invoke the right to remain silent. *Thompkins*, however, does not go quite so far, and we are satisfied that a suspect's nonverbal expressive conduct can suffice to invoke the right to remain silent. In fact, *Miranda* itself provides that the right to remain silent may be invoked "[i]f the individual [so] indicates *in any manner . . .*" (emphasis added). *Miranda, supra* at 473-474. We have recognized previously the communicative value of conduct for purposes of the hearsay rule. See *Commonwealth* v. *Gonzalez*, 443 Mass. 799, 803 (2005) ("conduct can serve as a substitute for words, and to the extent it communicates a message, hearsay considerations apply"). See also Mass. G. Evid. § 801(a)(2), at 230 (2011) (including within

definition of "statement" such "nonverbal conduct of a person, if it is intended by the person as an assertion").[5]

Moreover, given the nature of the right at issue — the right to remain silent — it seems sensible to recognize that a suspect may well communicate through conduct other than speech. "Advising a suspect that he has a 'right to remain silent' is unlikely to convey that he must speak (and must do so in some particular fashion) to ensure the right will be protected." *Thompkins, supra* at 2276 (Sotomayor, J., dissenting). Here, the defendant's conduct — an explicit headshake in response to a direct question — is sufficiently communicative so as to invoke his right to remain silent. See *Commonwealth* v. *Marrero*, 436 Mass. 488, 496 (2002) (recognizing that head nods and shakes in response to questioning constitute "deliberate nonverbal expression"). Thus, the record supports the motion judge's determination "that a reasonable police officer in the circumstances would understand" the gesture to be an invocation of the Miranda right. *Davis, supra.* Accordingly, the defendant satisfied the heightened standard of clarity called for in *Thompkins*, thereby invoking his right to remain silent under the Fifth Amendment.

Because the defendant invoked his Fifth Amendment right to remain silent, we must determine whether the officers "scrupulously honored" that right. See *Mosley, supra.* "In *Mosley*, the [United States] Supreme Court explored the question whether and in what circumstances the prosecution is prohibited from using a defendant's in-custody statement obtained after the right to remain silent had been invoked." *Commonwealth* v. *Taylor*, 374 Mass. 426, 432 (1978). In concluding that the officers had scrupulously honored the defendant's right to remain silent, the *Mosley* Court highlighted three factors: the police (1) had immediately ceased questioning; (2) resumed questioning "only after the passage of a significant period of time and the provision of a fresh set of warnings"; and (3) limited the scope of the later interrogation "to a crime that had not been a subject of the earlier interrogation." *Mosley, supra* at 106.

---

[5]Indeed, the majority of the Court in *Berghuis* v. *Thompkins*, 130 S. Ct. 2250, 2256-2258 (2010) (*Thompkins*) itself recognized the communicative value of nonverbal expressive conduct, noting that, over the course of his two hours and forty-five minutes of silence, the suspect occasionally "communicated by nodding his head."

None of these factors is present here. In response to the defendant's invocation of his right to cut off questioning, Lyles immediately began describing what the defendant could expect would follow. Although the motion judge found, and we agree, that the detectives were "very patient with the defendant in explaining his rights," they did not immediately cease questioning in the face of the defendant's unambiguous invocation of his right not to speak with them,[6] there was no pause in the interrogation, and the questioning that did ensue concerned the crimes for which the defendant had been arrested. Because the detectives did not scrupulously honor the defendant's right to remain silent and thereby elicited the incriminating response that is the subject of the defendant's motion to suppress, the motion judge was correct in concluding that the defendant's statements must be suppressed. See *Commonwealth* v. *Brant*, 380 Mass. 876, 882-886 (1980); *Commonwealth* v. *Taylor*, *supra* at 436.

b. *Article 12*. While the *Miranda* rule "protects both Fifth Amendment rights and rights guaranteed under art. 12," *Commonwealth* v. *Martin*, 444 Mass. 213, 218 (2005), we have not had occasion since the *Thompkins* decision to consider the scope of the analogous art. 12 protection in situations involving prewaiver invocations of the right to remain silent. If the defendant's conduct were to be construed as not meeting the heightened Federal standard, articulated in *Thompkins*, *supra*, for invocation of the right to remain silent, the question becomes whether art. 12[7] affords greater protection than the rule of *Thompkins* would provide. We take this occasion to address that question.

> "[S]tate courts cannot rest when they have afforded their citizens the full protections of the [F]ederal Constitution. State [C]onstitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of [F]ederal law."

---

[6]As described *infra*, where an individual makes a prewaiver statement that does not meet the heightened clarity test of *Thompkins*, officers do not violate art. 12 of the Massachusetts Declaration of Rights by asking questions aimed at clarifying the invocation of the right.

[7]Article 12 provides, in relevant part: "No subject shall . . . be compelled to accuse, or furnish evidence against himself."

Brennan, State Constitutions and the Protection of Individual
Rights, 90 Harv. L. Rev. 489, 491 (1977). See *Massachusetts* v.
*Upton*, 466 U.S. 727, 735-739 (1984) (Stevens, J., concurring in
the judgment). "[A] State is free as a matter of its own law to
impose greater restrictions on police activity than those this
Court holds to be necessary upon [F]ederal constitutional
standards." *Oregon* v. *Hass*, 420 U.S. 714, 719 (1975). These
admonitions are consistent with our art. 12 jurisprudence, in
which this court has "interpret[ed] the rights of our citizens
under art. 12 to be more expansive than those guaranteed by the
Federal Constitution." *Commonwealth* v. *Cryer*, 426 Mass. 562,
568 (1998).[8]

In determining whether the art. 12 privilege against self-
incrimination is more protective in this regard than that of the
Fifth Amendment, "we look to the text, history, and our prior
interpretations of art. 12, as well as the jurisprudence existing in
the Commonwealth before [*Thompkins*] was decided." *Com-
monwealth* v. *Mavredakis*, 430 Mass. 848, 858 (2000). As our
prior decisions interpreting art. 12 indicate, our guiding principle
must be whether the Federal rule provides adequate protection
for the right of Massachusetts citizens to remain silent during
police interrogation, thereby actualizing the defendant's right
under art. 12 to be free from being "compelled to accuse, or
furnish evidence against himself." See *id.* at 860. Both the text
and history of art. 12 support the view that it provides greater
protection against self-incrimination than the Fifth Amendment.
See *id.* at 858-859. See also Symposium on Tomorrow's Issues
in State Constitutional Law: How We Do It in Massachusetts,
38 Val. U. L. Rev. 405, 409-416 (2004). We therefore turn to
our previous applications of art. 12.

In assessing our pre-*Thompkins* jurisprudence, we must recall
that the requirement of heightened clarity imposed in *Thomp-
kins* derives from the 1994 United States Supreme Court deci-
sion in *Davis*, *supra*. Yet in *Davis*, the suspect had already

---

[8]Where we have deemed Federal law inadequate to protect rights guaranteed
under art. 12, we have not shied away from the promulgation of separate State
law rules as "adjuncts to the Miranda rule." *Commonwealth* v. *Ghee*, 414
Mass. 313, 318 n.5 (1993). See Symposium, The Law of American State
Constitutions; Criminal Procedure and the Massachusetts Constitution, 45
New Eng. L. Rev. 815 (2011).

waived his Miranda rights when, after one and one-half hours of questioning, he stated that "[m]aybe [he] should talk to a lawyer." *Davis, supra* at 455. The *Davis* Court held that, after suspects waive their rights, law enforcement officers may continue questioning them unless the suspects clearly request counsel. Unlike the postwaiver request for counsel at issue in *Davis*, the circumstances here involve the prewaiver invocation of the fundamental right to remain silent.

We have previously considered a suspect's waiver of his or her rights and concomitant willingness to talk to the police to be a critical factor in determining whether that suspect subsequently invoked his or her right to remain silent. Even before *Davis*, in *Commonwealth* v. *Pennellatore*, 392 Mass. 382, 387 (1984), we concluded that a defendant had not invoked his right to cut off questioning by saying, "I guess I'll have to have a lawyer for this," because he had been willing to talk before making the isolated comment and had thereby waived his rights. See *Commonwealth* v. *Hussey (No. 1)*, 410 Mass. 664, 671, cert. denied, 502 U.S. 988 (1991) (defendant's post-waiver statement that he had "nothing else he could say" did not invoke right to silence where he had demonstrated willingness to answer police questions); *Commonwealth* v. *Roberts*, 407 Mass. 731, 733-734 (1990) (postwaiver refusal to answer certain questions does not indicate desire to end questioning where defendant responded to some police questions); *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 265 (1982) (post-waiver statement that "I don't want to talk" did not invoke right to silence where defendant had already answered police questions and continued speaking with no further provocation than question, "And then what?"). In *Davis*, the Supreme Court recognized the vital importance of this distinction and predicated its requirement of heightened clarity on the fact that the alleged invocation of the right to counsel had occurred "after a knowing and voluntary waiver of the *Miranda* rights." *Davis, supra* at 461.[9]

Subsequent to and consistent with the 1994 *Davis* decision,

---

[9]On that basis, at least prior to *Thompkins*, "the majority of [S]tate supreme courts to consider the issue have reached the same conclusion" that the rule of *Davis* is limited to the postwaiver scenario. *United States* v. *Rodriguez*, 518

where we have held statements to be insufficient to invoke the right to remain silent, we have emphasized the postwaiver context in which those statements were made. In *Commonwealth* v. *Leahy*, 445 Mass. 481, 488-489 (2005), the defendant's postwaiver statement, "Not right now, in a minute. I need to figure some things out," did not invoke the right to silence, as the defendant had already responded to police questioning and his statement indicated a willingness to speak with the police at a future time. See *Commonwealth* v. *Sicari*, 434 Mass. 732, 748-749 (2001), cert. denied, 534 U.S. 1142 (2002) (prolonged thirty- to forty-minute silence within context of lengthy interview with police did not invoke right to silence where defendant had signed two separate waivers of that right);[10] *Commonwealth* v. *Senior*, 433 Mass. 453, 462-463 (2001) (postwaiver refusal to answer certain questions does not invoke right to silence where defendant responded to other police questions).

Our pre-*Thompkins* jurisprudence accords with the view that the "fundamental purpose of . . . *Miranda* [is] 'to assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process.' " *Connecticut* v. *Barrett*, 479 U.S. 523, 528 (1987), quoting *Miranda*, *supra* at 469. In the postwaiver context, a suspect has already made this choice. Indeed, in Massachusetts, an effective waiver

---

F.3d 1072, 1079 n.6 (9th Cir. 2008). For example, in *Almeida* v. *State*, 737 So. 2d 520, 523 n.7 (Fla. 1999), the Supreme Court of Florida held that the requirement of clarity "applies only where the suspect has waived the right earlier during the session." See *State* v. *Collins*, 937 So. 2d 86, 93 (Ala. Crim. App. 2005); *Noyakuk* v. *State*, 127 P.3d 856, 869 (Alaska Ct. App. 2006); *State* v. *Holloway*, 760 A.2d 223, 228 (Me. 2000); *Freeman* v. *State*, 158 Md. App. 402, 429-430 (2004); *State* v. *Tuttle*, 650 N.W.2d 20, 28 (S.D. 2002); *State* v. *Turner*, 305 S.W.3d 508 (Tenn. 2010); *State* v. *Leyva*, 951 P.2d 738, 743 (Utah 1997).

[10]Our decision in *Commonwealth* v. *Almonte*, 444 Mass. 511, 519, cert. denied, 546 U.S. 1040 (2005) (*Almonte*), is not to the contrary. Although *Almonte* stated that "[a] defendant's invocation of the right to remain silent must be clear and unequivocal," the defendant in that case demonstrated a willingness to answer police questions by surrendering himself and speaking with officers before his alleged invocation of his right to silence, just as in the cases cited above. In *Almonte*, therefore, we did not have occasion to consider the issue we now reach and resolve. Furthermore, in support of this proposition, *Almonte* cited *Commonwealth* v. *Sicari*, 434 Mass. 732, 749 n.13 (2001), cert. denied, 534 U.S. 1142 (2002), in which we expressly declined to resolve the question whether to apply *Davis* in the context of the right to remain silent.

means that the suspect has demonstrated beyond a reasonable doubt that he or she has chosen to waive the rights to silence and counsel. See *Commonwealth* v. *Day*, 387 Mass. 915, 920-921 (1983). As a result, our case law recognizes that it makes sense to expect heightened clarity from a suspect who wants to change course and cease interrogation after having already indicated a desire to continue questioning. Prewaiver, however, the suspect has yet to exercise the choice between speech and silence that underlies *Miranda*. To require a suspect, before a waiver, to invoke his or her right to remain silent with the utmost clarity, as called for by *Thompkins*, would ignore this long-standing precedent and provide insufficient protection for residents of the Commonwealth under art. 12.

Adherence to the rule in *Thompkins* is particularly inappropriate in the context of the right to remain silent. *Miranda* itself stated that the right to remain silent is the preeminent right protected by the Fifth Amendment's privilege against self-incrimination, and that the right to counsel exists to provide added protection for that right. See *Miranda, supra* at 469 ("The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today"). The right to remain silent is the right to refuse to provide compelled testimony against oneself — the essence of the privilege against self-incrimination. To impose a heightened standard of clarity as a prerequisite for prewaiver invocation of the right to remain silent would strike at the core of the privilege against self-incrimination.

Furthermore, a suspect's failure to invoke the right to remain silent with heightened clarity, particularly in the absence of a prior waiver, does not necessarily reflect uncertainty.[11] There are a number of other reasons a suspect might speak imprecisely.

---

[11]One commentator has stated, "[I]t is *highly likely* that, for a variety of reasons, what is deemed an ambiguous invocation is intended by the suspect as a clear assertion of her rights" (emphasis added). Strauss, The Sounds of Silence: Reconsidering the Invocation of the Right to Remain Silent Under *Miranda*, 17 Wm. & Mary Bill Rts. J. 773, 808 (2009)

As Justice Souter observed in *Davis,* "[c]riminal suspects who may (in *Miranda*'s words) be 'thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures,' [*Miranda, supra*] at 457, would seem an odd group to single out for the Court's demand of heightened linguistic care. A substantial percentage of them lack anything like a confident command of the English language, . . . many are 'woefully ignorant,' . . . and many more will be sufficiently intimidated by the interrogation process or overwhelmed by the uncertainty of their predicament that the ability to speak assertively will abandon them" (citations omitted). *Davis, supra* at 469-470 (Souter, J., concurring in the judgment). In addition, "discrete segments of the population — particularly women and ethnic minorities — are far more likely than others to adopt indirect speech patterns." Ainsworth, In a Different Register: The Pragmatics of Powerlessness in Police Interrogation, 103 Yale L.J. 259, 261 (1993). Suspects falling into such categories should not be denied a constitutional right by reason of their hesitance ab initio to state their intent with perfect clarity. See *Miranda, supra* at 472 ("The privilege against self-incrimination secured by the Constitution applies to all individuals"). A suspect's ambiguous invocation in that context should not be treated as if the suspect had said nothing at all.

This is especially important because, if the initial statement is intended as an actual invocation of the right to remain silent but fails to meet the heightened *Thompkins* standard, a suspect may not try later to reassert his or her rights if the police appear to ignore the invocation by continued questioning. "When a suspect understands his (expressed) wishes to have been ignored . . . in contravention of the 'rights' just read to him by his interrogator, he may well see further objection as futile and confession (true or not) as the only way to end his interrogation." *Davis, supra* at 472-473 (Souter, J., concurring in the judgment). That is precisely what the requisite preinterrogation recitation of Miranda warnings to suspects is meant to guard against.

We therefore hold that, even if the defendant's conduct was insufficient to meet the Federal *Thompkins* standard, the defendant acted with sufficient clarity to invoke his art. 12 right to remain silent. We decline to adopt the *Thompkins* approach to

invocation,[12] which permits police to continue questioning a person in custody who has never waived his right to remain silent until such time as that person articulates with utmost clarity his desire to remain silent. Such a rule "turns *Miranda* upside down" by placing too great a burden on the exercise of a fundamental constitutional right. *Thompkins, supra* at 2278 (Sotomayor, J., dissenting). We have never placed a "burden of clarity" on individuals in such circumstances, *Davis, supra* at 470 (Souter, J., concurring in the judgment), and we decline to do so today. Our holding is not a departure from our prior jurisprudence and, unlike the Court in *Thompkins*, does not establish a new standard for prewaiver invocations of the right to silence. Instead, we continue to adhere to the standard set forth in *Mosley*: "The suspect's 'right to cut off questioning' must be 'scrupulously honored.' " *Thompkins, supra* at 2275 (Sotomayor, J., dissenting), quoting *Mosley, supra* at 104. This standard provides a workable solution, as the police have "for nearly [thirty-six] years applied *Mosley*'s fact-specific standard in questioning suspects who have invoked their right to remain silent." *Thompkins, supra* at 2276 (Sotomayor, J., dissenting). As always, to avoid the difficulties inherent in the application of a fact-specific standard, "[i]f a suspect makes an ambiguous statement or engages in conduct that creates uncertainty about his intent to invoke his right, police can simply ask for clarification." *Id.* (Sotomayor, J., dissenting).

When law enforcement officials reasonably do not know whether a suspect wants to invoke the right to remain silent, there can be no dispute that it is a "good police practice" for

---

[12]We decline also to adopt the *Thompkins* approach to waiver, i.e., that when Miranda warnings have been given and understood, "an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Thompkins, supra* at 2262. In effect, the court in *Thompkins* reversed the burden of proof applicable to waiver: under Federal law, waiver will now be presumed from the very fact that the defendant made any uncoerced statements, but the defendant cannot invoke his right to remain silent unless he does so with the utmost clarity. As a matter of State law, we continue to impose a "heavy burden" on the Commonwealth in proving waiver, *Commonwealth* v. *Dustin*, 373 Mass. 612, 614 (1977), quoting *Miranda, supra* at 475. Indeed, the ambiguity of a defendant's invocation, if not then clarified, may itself hamper the Commonwealth in establishing, beyond a reasonable doubt, the validity of any subsequent waiver. See *Commonwealth* v. *Hoyt, ante* 143, 155-156 (2011).

them to stop questioning on any other subject and ask the suspect to make his choice clear. *Davis, supra* at 461.[13] Although we do not today mandate it, such clarification, "the intuitively sensible course," *id.* at 473 (Souter, J., concurring in the judgment), has the benefit both of ensuring protection of the right if invoked and of minimizing the chance of suppression of subsequent statements at trial if not. To the extent that most invocations of the Miranda rights come immediately after the warnings are read, see Symposium: Miranda After Dickinson: The Future Concession of Law; Miranda's Mistake, 99 Mich. L. Rev. 975, 988 (2001) (citing studies where "[a]lmost no one invokes his Miranda rights once questioning has begun"),[14] clarifying pre-waiver invocations will provide added and timely protection for those rights. Far from creating any "wholly irrational obstacles" to police investigation, *Mosley, supra* at 102, moreover, the process of asking, in a brief and even-handed fashion, simple clarifying questions does not burden the police.

An important corollary, however, is that where the initial request to invoke the right to remain silent is clear such that a reasonable police officer in the circumstances would understand the statement to be an actual invocation, "the police may not create ambiguity in a defendant's desire by continuing to question him or her about it." *Connecticut* v. *Barrett*, 479 U.S. 523, 534 n.5 (Brennan, J., concurring in the judgment).[15] The process of clarification may not be converted into " 'badger[ing]'

---

[13]The Commonwealth agreed during oral argument, describing the process of asking clarifying questions as a "best practice."

[14]See Leo, The Impact of *Miranda* Revisited, 86 J. Crim. L. & Criminology 621, 653 (1996) (finding that, out of 182 Mirandized suspects observed in California police departments, thirty-eight invoked those rights, but thirty-six of those invocations came immediately after warnings were read and only two came during course of questioning); Cassell, Police Interrogation in the 1990s: An Empirical Study of the Effects of *Miranda*, 43 UCLA L. Rev. 839, 859-860 (1996) (finding, in 129 interrogations, that twenty-one suspects invoked their rights at outset and only five invoked during questioning).

[15]Here, the detectives did not restrict their subsequent questioning to a clarification of the defendant's gesture. Rather than ask, "I saw you shake your head, does that mean you do not want to talk to us?" Lyles instead let the defendant know that he was being charged and detained, that he would have to seek to be admitted to bail or go to court the next morning, and that, if he did not want to talk to them, he would not "get to walk up out of here and go home right now." Ahlborg went on to tell the defendant that "if you don't

or 'overreaching' — explicit or subtle, deliberate or unintentional — [that] might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request" to remain silent and end questioning. *Smith* v. *Illinois, supra* at 98. "Such measures are foreign to the purpose of clarification, which is not to persuade but to discern." *Thompson* v. *Wainwright,* 601 F.2d 768, 772 (5th Cir. 1979). Nor may postrequest responses to further questioning "be used to cast retrospective doubt on the clarity of the initial request itself." *Smith* v. *Illinois, supra* at 100.

It may be that application of this standard entails, as it has in the past, the loss of certain pretrial confessions. Our system of justice, however, is not predicated on the fear that suspects will invoke their rights. See *Escobedo* v. *Illinois,* 378 U.S. 478, 490 (1964). "While these lost confessions do extract a real price from society, it is one that *Miranda* itself determined should be borne." *Davis, supra* at 474 (Souter, J., concurring in the judgment).

Here, for the reasons discussed, the officers did not "scrupulously honor[]" the defendant's invocation of his right to remain silent. Accordingly, his subsequent incriminating statements were correctly suppressed.

*Order allowing motion to suppress affirmed.*

---

want to speak to me, we're going to end this and put you back in the cell." These statements may have clarified what the defendant could expect to happen next, but they did not clarify the meaning of the headshake.