NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12936


COMMONWEALTH  vs.  EDWARD GONZALEZ.



Hampden.     December 2, 2020. - June 16, 2021.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, & Kafker, JJ.



Constitutional Law, Assistance of counsel, Waiver of
    constitutional rights, Admissions and confessions,
    Voluntariness of statement.  Practice, Criminal, Motion to
    suppress, Assistance of counsel, Admissions and
    confessions, Voluntariness of statement.  Evidence,
    Voluntariness of statement.




Indictments found and returned in the Superior Court
Department on July 22, 2016.

A pretrial motion to suppress evidence was heard by John S.
Ferrara, J.

An application for leave to prosecute an interlocutory
appeal was allowed by Gaziano, J., in the Supreme Judicial Court
for the county of Suffolk, and the appeal was reported by him to
the Appeals Court.  After review by the Appeals Court, the
Supreme Judicial Court granted leave to obtain further appellate
review.


Katherine E. McMahon, Assistant District Attorney, for the
Commonwealth.
Marissa Elkins for the defendant.

GAZIANO, J. The defendant was arrested on charges of murder in the first degree, G. L. c. 269, § 1; and possession of a firearm without a license, G. L. c. 269, § 10 (a). Police interviewed him in an interrogation room at the Springfield police department shortly after he was arrested. Although the defendant initially agreed to waive his Miranda rights and speak with police, approximately twenty minutes after the interview began, he requested to speak with an attorney and the interview was terminated. Following a period of forty-five minutes during which the defendant remained in the interrogation room with one of the officers who had been conducting the interview, the defendant again waived his Miranda rights and agreed to speak with police; he was interviewed again for approximately one hour. The defendant subsequently sought to suppress all of the statements he made after having invoked his right to counsel. A Superior Court judge allowed the motion to suppress after concluding that the Commonwealth had not established beyond a reasonable doubt that the defendant reinitiated the interview and knowingly, voluntarily, and intelligently waived his right to counsel. Deferring to the judge's findings of fact and credibility determinations, we affirm the decision allowing the motion to suppress.

1. Factual background. We summarize the relevant facts from the judge's findings following a three-day evidentiary

hearing on the motion to suppress, supplemented by other undisputed evidence introduced at the hearing that is not contrary to the judge's findings.  See Commonwealth v. Alexis, 481 Mass. 91, 93 (2018), citing Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).

The defendant was arrested on May 26, 2016, in connection with a backyard shooting that had taken place in Springfield in January of that year.  The victim was the father of a State police trooper, and the case became "high profile."  The day before the defendant's arrest, a codefendant, who had been identified through deoxyribonucleic acid testing of evidence found at the scene, had been arrested in Holyoke; when interviewed over a period of four to five hours, he pointed to the defendant as also having been involved in the shooting. Several officers of the Springfield police department, including the captain of the major crimes unit and two of the detectives who later interviewed the defendant, were present in Holyoke and watched the interrogation of the codefendant.  On the basis of that interview, Springfield police Captain Trent Duda obtained a warrant for the defendant's arrest.  The defendant was arrested at 12:30 A.M. on May 26, and brought to the Holyoke police station, where he underwent a "courtesy" booking and was given Miranda warnings; about forty-five minutes later, he was transported to Springfield police headquarters.

Because the defendant's primary language was Spanish, Duda assigned a Spanish-speaking detective, Jose Canini, who had watched the interview of the codefendant, and Sergeant Jeffrey Martucci, the most senior officer on duty apart from Duda, to interview the defendant. The interview began at 1:52 A.M. on May 26, 2016, and was audio-video recorded. Martucci advised the defendant that he was under arrest for murder and had the defendant read the Miranda[1] warnings in English; Martucci testified that he did so after the defendant had told the officers that he could understand, read, and speak English. The defendant waived his rights, signed the waiver form, and agreed to speak with the officers. While most of this interview was conducted in English, the defendant's speech and his responses to certain questions indicated some difficulty comprehending English, and more comfort speaking in Spanish. Certain questions were posed by Canini in Spanish, and the defendant sometimes answered in the same language.[2]

---

[1] See Miranda v. Arizona, 384 U.S. 436, 444-445 (1966).

[2] At the beginning of the interview, the officers engaged in the following exchange with the defendant, with Canini and the defendant conversing in Spanish, concerning his ability to make a telephone call:

Canini: "Do you want to call anybody when we're done?"

The defendant: "I'm going to call my -- my wife."

During this interview, the defendant denied any involvement in the shooting.  In response to Martucci's and Canini's repeated assertions that someone had placed the defendant at the scene, the defendant asked the officers who had done so and requested to see any photographs, video recordings, or other incriminating evidence showing that he had been there. Approximately fifteen minutes into the interview, Duda, who had been monitoring the interrogation through a live audio-video feed, became frustrated and felt that the interview was "going

---

Canini:  "He's gonna give a call to his wife.  When we're done."

The defendant:  "Yes."

Canini:  "When we're done, he's gonna call his wife."

Martucci:  "OK.  So, all right.  We'll let you use the phone when we're done talking, if that's -- if that's fine with you."

The defendant:  "Huh?"

Canini:  "So, when we're done."

The defendant:  "Oh, and he -- he, again, like he said --"

Canini:  "No, he said, 'When we're done, I'm going to -- we'll let you talk to your wife.'  Is that all right with you?  Yes or no?"

The defendant:  "Right now, or what?"

Canini:  "Whatever you want."

The defendant (in English):  "Yeah, when we're done."

Martucci:  "OK.  Great."

off the rails" because the defendant was asking more questions than he was answering. Duda entered the interrogation room and began yelling and swearing at the defendant. Among other things, Duda said that the defendant might be a "big tough guy" in Holyoke but he "ain't shit" in Springfield, and there were many "enemies" in jail. Duda told the defendant, "I'm done with you. . . . Either you come clean, or you get booked and you go to fucking jail for murder. That's all it comes down to. That's all it comes down to, dude. I don't give a fuck about you. I don't care. You're in here, sitting here, to tell a story. Either you tell it, or you don't."[3] According to the transcript, the defendant responded, "No, I ain't speaking." Duda then left the room and the interrogation continued, with Canini and Martucci placing increased pressure on the defendant to explain his involvement in the shooting, using profanity and telling him it was over and he was going to jail, while the defendant asked, "Why -- why are you yelling at me?"

A few moments after Duda walked out, the defendant asked, in Spanish, "Can I call my lawyer?" Canini initially responded,

_____

[3] At the hearing on the motion to suppress, Duda agreed that the transcript of the first interview did not indicate that he had participated in it, and that certain statements, including instances of profanity and yelling, were incorrectly attributed in the transcript to Martucci, when in fact it was Duda who had made the statements. The other officers who testified at the hearing also were asked about, and recognized, this discrepancy in the transcript.

in Spanish, "OK?  Someone put you there.  Someone put you there, OK?"  The defendant again asked in Spanish, "Can I call my lawyer?"  The following exchange then took place:

Canini (in English):  "So -- he's asking for the lawyer."

Martucci:  "You want what?"

The defendant:  "My lawyer."

Martucci:  "You want your lawyer?"

The defendant:  "Yeah."

Martucci:  "OK.  Alright.  It's 2:11 A.M.  We're gonna conclude this investigation, and --"

Canini:  "Call them, and turn it off."

Martucci:  "Yep.  Give me a sec.  I'm gonna call down, turn off the video, and you're gonna be booked for murder, OK?"

The defendant:  "Call my -- call my lawyer."

Canini:  "OK.  He's gonna turn this off."

Martucci:  "We're gonna stop interviewing you, and you'll be booked for murder."

Canini:  "You're gonna be booked for murder."

The defendant:  "Alright.  Call my lawyer."

Canini:  "You can call your murder -- your lawyer -- later on."

Martucci:  "Can you have them turn off Room A, please?  Yep.  Have them turn it off."

The defendant:  "Because, right now . . . ."

Canini:  "Stop talking.  You just said you want a lawyer, and we can't talk to you."

The judge found that the defendant said that he wanted his attorney four times before the interview was terminated.  The judge noted that it was clear from Canini's words and tone that he was frustrated and angry that the defendant had asked for counsel.

Martucci left the room, and Canini remained alone with the defendant in the interview room, waiting to be told to bring the defendant to booking.  All four of the officers involved in the interviews testified that the process for booking a defendant who had been arrested for murder differed from other bookings, and that a supervisor -- that night, either Duda or Martucci -- would call the booking sergeant to arrange a time to bring such a defendant down to the first floor for booking, something detectives could do only with a supervisor's authorization.  Although defendants arrested for murder sometimes would be brought a telephone in the interview room, ordinarily they would be given the opportunity to make a telephone call when they reached the booking area.  While waiting to go to booking, a defendant who had been arrested for murder would not be left alone.

None of the interrogating officers testified as to the identity of the officer who had been in charge of the booking area at the time, or which officer ultimately called to have the defendant brought down to the first floor for booking, nor could

they explain the reasons for the delay in bringing the defendant to be booked.  Duda testified that he "assumed" that Martucci had called the booking supervisor,[4] and did not know the reason for the delay in bringing the defendant down to be booked.  Martucci testified that he did not remember if he had called the booking supervisor.

At the evidentiary hearing, Canini said that, while waiting to be brought to booking, the defendant asked to use the bathroom and Canini escorted him, handcuffed, to the bathroom, which was down the hall on the second floor.  Canini and the defendant encountered Duda in the hallway; Duda testified that they did not speak.  Canini then brought the defendant back to the interrogation room and engaged in conversation.  Canini could not recall any of the topics they discussed, although he stated that the conversation involved "some general talk, but not about what was going on," and that the defendant "did not say anything of evidentiary significance."  Canini did remember, "[W]e weren't silent in there.  I'll tell you that much, we weren't silent."  Canini also testified that the defendant asked what would happen next and Canini explained the booking process, stating that "at some point he was going to go downstairs.  He was going to be in front of a sergeant, they were going to ask

_____

[4] In his decision, the judge employed quotation marks around this word.

him questions, he would get a phone call, he'd get fingerprinted and photographed." The defendant later told Canini that he would "talk to him but, did not want to get yelled at." Canini did not prepare a report memorializing this conversation, nor was the conversation recorded.

Canini recounted that, after the defendant had indicated that he was willing to resume the interview without having counsel present, Duda entered the interview room and told Canini to bring the defendant down for booking. According to Canini, it was then that Canini told Duda that the defendant was willing to speak once again with police. Duda testified that he had been sitting in his office when someone advised him that the defendant wanted to resume speaking with the officers; Duda could not remember who had told him of this development. The judge noted that Duda had watched the first interview of the defendant on the monitor from the detective's room, but could not remember what he did after the defendant invoked his right to counsel. The judge also commented that Detective Edward Podgurski had watched "bits and pieces" of the interview on the remote monitors, but did not remember doing so after the defendant invoked his right to counsel. The judge observed that Duda had remained at the police station after the invocation, notwithstanding the large number of hours he already had worked

by that point, and that he was not then scheduled to be on duty, but could not recall the work he had done.

Approximately forty-five minutes after the conclusion of the first interview, Podgurski and Canini commenced a second recorded interview of the defendant, at 2:56 A.M. On instruction by Duda, Podgurski showed the defendant the Miranda waiver form that the defendant had executed at the beginning of the first interview. Podgurski told the defendant, "And you signed off on this Miranda form earlier this evening. Approximately not even about a half hour-hour ago, and I just wanna -- We gave you an opportunity to go the bathroom and as we were bringing you to get booked you said you wanted to talk to us again." The defendant responded, "Um-huh." Podgurski confirmed, "Is this correct?" and the defendant again said, "Um-huh."

Podgurski then repeated the Miranda warnings and asked, "Having these rights in mind . . . , do you want to talk to . . . Canini and myself right now about what you are being charged with?" The defendant responded, "Um-huh." The defendant then went on to speak to the officers for slightly more than one hour. The defendant was interviewed by State police in a subsequent interview, concerning a different investigation, at around 4 A.M.

2. _Procedural background_.  The defendant filed a motion in the Superior Court to suppress the statements he made to police after he initially invoked his right to counsel.  Following a three-day evidentiary hearing, the judge allowed the motion to suppress; the judge reasoned that the Commonwealth had failed to establish beyond a reasonable doubt that the defendant had reinitiated communication with the police after he invoked his right to counsel.  The Commonwealth sought leave to pursue an interlocutory appeal in the county court pursuant to Mass. R. Crim. P. 15 (a) (2), as amended, 476 Mass. 1501 (2017), and a single justice of this court allowed the appeal to proceed in the Appeals Court.  The Appeals Court reversed the allowance of the motion to suppress, on the ground that the judge's inferences and conclusions were not supported by the record, see Commonwealth v. Gonzalez, 96 Mass. App. Ct. 1107 (2019), and we allowed the defendant's petition for further appellate review.

3. _Standard of review_.  In reviewing a ruling on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of [the judge's] ultimate findings and conclusion of law."  Commonwealth v. Tremblay, 480 Mass. 645, 652 (2018), quoting Commonwealth v. Clarke, 461 Mass. 336, 340 (2012).  "The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses, and

not of this court." Commonwealth v. Neves, 474 Mass. 355, 360 (2016), quoting Commonwealth v. Moon, 380 Mass. 751, 756 (1980). At the same time, we "make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." Commonwealth v. Howard, 469 Mass. 721, 726 (2014), S.C., 479 Mass. 52 (2018), quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004). See Commonwealth v. Miller, 486 Mass. 78, 81-82 (2020), citing Clarke, supra.

Our deference to the judge's assessment of the weight and credibility of testimonial evidence includes inferences "derived reasonably from the testimony." Commonwealth v. Kennedy, 426 Mass. 703, 708 (1998). "[T]he drawing of permissible inferences in an action at law is a question of fact; it is a function of the fact finding tribunal and not of this court on review of questions of law." Commercial Credit Corp. v. Commonwealth Mtge. & Loan Co., 276 Mass. 335, 340 (1931). Nonetheless, the deference accorded to the factual findings of a motion judge who saw and heard the witnesses does not extend to documentary evidence, such as recorded statements. Although "an appellate court may independently review documentary evidence, and . . . lower court findings drawn from such evidence are not entitled to deference . . . [,] findings drawn partly or wholly from testimonial evidence are accorded deference, and are not set

aside unless clearly erroneous. . . . The case 'is to be decided upon the entire evidence,' however, giving 'due weight' to the judge's findings that are entitled to deference" (citation omitted). Tremblay, 480 Mass. at 654-655.

4. Discussion. At the hearing on the motion to suppress, as before this court, the parties agreed that the evidence at the hearing established that the defendant was in custody when he made the statements, he was given proper Miranda warnings, and he voluntarily, knowingly, and intelligently waived his Miranda rights. After speaking to the officers for some minutes, he then undoubtedly invoked his right to counsel. The parties also agree that the conduct of the officers, evident on the audio-video recording of the first interview, clearly supports the judge's finding that the tenor of the interview was aggressive, and that Canini was angry and frustrated by the defendant's decision to invoke his right to speak with an attorney. The judge did not specifically discuss Martucci's feelings, but the portion of the last minutes of the interview that the judge quoted in his decision also supports a similar conclusion.

Thus, given the absence of dispute on these points, the two narrow questions before us, as at the hearing, concern, first, the events between the first interview and the second interview, during the forty-five minute period in which no recording took

place, where the judge found that the Commonwealth had not established beyond a reasonable doubt that the defendant had reinitiated a conversation with police; and, second, whether the defendant's right to a telephone call under G. L. c. 276, § 33A, was violated by the officers' far less than adequate explanations of the right, their apparent disregard for ensuring that he could exercise that right, or their failure to allow him to use a telephone once the interview was over, after having said that he would be able do so at that time.[5]  While all of the witnesses were cross-examined on these issues, after having allowed suppression as a result of the first issue, the judge did not make any findings or rulings as to whether the statute was violated and the defendant was deprived of his rights under it; we, too, discern no need to reach the issue, given our conclusion on the question of reinitiation.

a.  Reinitiation after invocation of right to counsel.  The defendant asserts that there was no error in the judge's decision that the Commonwealth failed to meet its burden to show beyond a reasonable doubt that the defendant reinitiated the

---

[5] There also is some indication, based on the officers' explanations at the beginning of the first interview, that the defendant did not fully understand his right to use a telephone or their explanations, and the structure of the questions posed appeared designed to obtain an affirmative response to waiting until after the interview before making any calls.  Ultimately, however, the defendant acceded to the proposal that he would call his wife after the interview ended ("when we're done").

conversation with police; he maintains that this court should defer to the judge's explicit inference that Canini's presence in the interrogation room, and his "general" conversation, were designed to, and indeed did, "effect[]" the defendant's decision to speak to police without an attorney present. The defendant argues that the judge's finding that Canini's and Podgurski's "self-serving" statements about what occurred during the unrecorded period "shed[] no light" on what actually happened was fully supported by the record.

The Commonwealth argues that the judge's finding that the Commonwealth did not meet its burden to prove that the defendant initiated the "further communications, exchanges, or conversations" with police is not supported by the record, where the judge made no explicit finding that Canini was not credible, and where Canini testified that no conversation about the offense took place during the period in which he was alone with the defendant in the interrogation room. The Commonwealth maintains that this court is in as good a position as was the judge to review the audio-video recordings and the defendant's one-word responses at the beginning of the second interview "corroborate" Canini's testimony that, sometime after his invocation of his right to counsel, the defendant requested to speak with police so long as they did not "yell" at him. The Commonwealth argues as well that the judge did not appropriately

consider the Commonwealth's corroborating evidence, specifically the audio-video recording of the beginning of the second interview, which, both Podgurski and Canini testified, showed the defendant's reinitiation and corroborated Canini's testimony that the defendant voluntarily reinitiated the interview and waived his right to counsel.  The Commonwealth contends that this evidence demonstrates beyond a reasonable doubt that the defendant voluntarily, knowingly, and intelligently waived his right to silence and right to counsel, see Edwards v. Arizona, 451 U.S. 477, 484-486 (1981), and that the judge engaged in "impermissible speculation" in reaching his conclusion that the Commonwealth failed to meet its burden.

We conclude that there was no error in the judge's findings, including his reasonable inferences drawn from testimony at the hearing on the motion to suppress, that the Commonwealth failed to meet its burden to show, beyond a reasonable doubt, that the defendant had reinitiated conversation with police.  Accordingly, the order allowing suppression of the defendant's statements after he invoked his right to counsel must be affirmed.

i.  Invocation of right to counsel.  The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  In Miranda v. Arizona, 384 U.S. 436,

444 (1966), the United States Supreme Court extended this protection against self-incrimination to custodial interrogations and required that law enforcement officers provide warnings to a suspect "that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." See Commonwealth v. Hoyt, 461 Mass. 143, 149 (2011).

A defendant's invocation of his or her right to counsel must be "scrupulously honored." Commonwealth v. Thomas, 469 Mass. 531, 541 (2014), quoting Michigan v. Mosley, 423 U.S. 96, 103-104 (1975). See Edwards, 451 U.S. at 484-485. Once a defendant invokes his or her right to counsel, all questioning must cease. See id. at 484; Thomas, supra at 539. Questioning may not resume until an attorney is obtained for the suspect and is present, or the suspect initiates "further communication, exchanges, or conversations with the police. See Thomas, supra, quoting Edwards, supra at 484-485. If a defendant does reinitiate further communication, "[t]he Commonwealth has the burden of proving beyond a reasonable doubt that subsequent events indicated a voluntary, knowing, and intelligent waiver of the right to have counsel present and of the right to remain silent." Commonwealth v. Rankins, 429 Mass. 470, 473 (1999), citing Oregon v. Bradshaw, 462 U.S. 1039, 1044 (1983). See Commonwealth v. Monroe, 472 Mass. 461, 468 (2015).

To determine whether the Commonwealth has met this burden, a reviewing court must "examine whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act." Commonwealth v. Selby, 420 Mass. 656, 663 (1995), S.C., 426 Mass. 168 (1997). See Miller, 486 Mass. at 87-88. It is not enough to show that a defendant agreed to speak to police after a repetition of the Miranda warnings. See Edwards, 451 U.S. at 484-485; Thomas, 469 Mass. at 539. Otherwise put, the Commonwealth must establish beyond a reasonable doubt that police did not initiate the discussion that led to the defendant rescinding the invocation of the right to counsel. See Hoyt, 461 Mass. at 151. Once invoked, a reviewing court indulges "in every reasonable presumption against" a defendant's waiver of his or her constitutional rights. Commonwealth v. Anderson, 448 Mass. 548, 554 (2007), quoting Commonwealth v. Torres, 442 Mass. 554, 571 (2004).

ii. Analysis. While the judge stopped short of explicitly stating that any of the officers were "credible" or "not credible," he substantively and repeatedly indicated his expressed view that the "self-serving" testimony by Canini and Podgurski "sheds no light on what transpired" after the first recording ended. Indeed, the judge's reference to the "second"

interview, twice, in quotation marks, plainly suggests some skepticism about the defendant's reinitiation. In particular, the judge pointed to Podgurski's recorded statement at the beginning of the second interview, "We gave you an opportunity to go to the bathroom and as we were bringing you to get booked you said you wanted to talk to us again," to which the defendant responded, "Um-huh." This statement was contrary to testimony by all of the other officers, as well as the summary of the reinitiation by Canini, depicted within minutes on the same audio-video recording, that the defendant was never brought to booking.

The judge also pointed to Canini's insistence that the "general" talk in which he and the defendant engaged for forty-five minutes (the substance of which Canini could not remember) "did not discuss any aspect of the case." The judge noted that, had the Commonwealth had the burden to prove this assertion by a "mere preponderance of the evidence," Canini's testimony, "if the court credits Canini's assertion," "might suffice," but it did not meet the Commonwealth's actual burden of proof beyond a reasonable doubt. The judge then found that Canini, "clearly displeased with [the defendant's] invocation of his right to counsel, continued to speak with him," and that that it was "reasonably inferred that Canini's object in his continued

conversation with [the defendant] was to persuade him to change his mind" regarding the invocation of his right to counsel.

The judge also noted that Canini, as well as the other experienced officers involved in the investigation, "necessarily understood that evidence of [the defendant's] conversation with Canini after his invocation of his right to counsel would be important," but opted not to record the conversation despite the ready availability of the means to do so, and not to document it in a report.  Both of these reasonable inferences provide support for the judge's evident suspicion that, in that forty-five minute time period, the involved officers convinced the defendant to waive his constitutional rights.

Relatedly, the judge discredited some of the testimony by the other interrogating officers.  The judge found that "the conversation [during the interim period] was likely being monitored by other officers, including [Duda]," notwithstanding Duda's assertions that, after having observed (and interrupted) the first interview, he had not watched the monitor after the invocation, yet he could not explain what he was working on during that time, nor why he would remain at the police station for so many hours when he was not scheduled to be present.  The judge also pointed to Podgurski having watched some portions of the first interview remotely, as well as his presence in the building long after his shifts ordinarily would have ended, and

his lack of any memory of the work he was conducting during the period when the interrogation room was not being recorded.

Because the judge's ultimate conclusion regarding the voluntariness of the defendant's second waiver of his right to counsel "is so dependent on an assessment of witness credibility," specifically Canini's credibility, "and is based on what we consider to be a reasonable inference, we defer to [his] finding." Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 553 (1997). As discussed, substantial deference is due to a motion judge's findings of fact and drawing of reasonable inferences, which "need only be reasonable and possible," not "necessary or inescapable" (citation omitted). Kennedy, 426 Mass. at 708. "The drawing of permissible inferences in an action at law is a question of fact; it is a function of the fact finding tribunal and not of this court on review of questions of law." Commercial Credit Corp., 276 Mass. at 340.

Here, no clear error is apparent in the judge's findings and rulings, and the record, to the extent it exists, supports the judge's findings. Consistent with the judge's ultimate determination are the undisputed facts that Gonzalez was kept in a small interrogation room for an extended period of time with an officer who had been openly hostile toward him, but who was the only Spanish-speaking detective available, and that the

"general" conversation, regardless of intent, did have the effect of reversing the defendant's prior decision to obtain legal assistance.  See Commonwealth v. Sanchez, 476 Mass. 725, 738-739 (2017); Commonwealth v. Brant, 380 Mass. 876, 883, cert. denied, 449 U.S. 1004 (1980).

In sum, we discern no error in the judge's determination that the Commonwealth has not proved beyond a reasonable doubt that the events following the defendant's initial invocation of his right to counsel indicate a subsequent voluntary, knowing, and intelligent waiver of his constitutional right to counsel under the Fifth Amendment.

Order allowing motion
to suppress affirmed.