NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11839

COMMONWEALTH  vs.  RYAN D. WELCH.


Hampshire.     February 5, 2021. - May 14, 2021.

Present:  Budd, C.J., Gaziano, Lowy, Kafker, & Wendlandt, JJ.


Homicide.  Constitutional Law, Search and seizure, Admissions
     and confessions, Voluntariness of statement, Privacy.
     Privacy.  Search and Seizure, Expectation of privacy,
     Hospital.  Hospital.  Evidence, Admissions and confessions,
     Voluntariness of statement, Authentication, Prior
     misconduct.  Cellular Telephone.  Practice, Criminal,
     Motion to suppress, Admissions and confessions,
     Voluntariness of statement, New trial, Assistance of
     counsel, Capital case.




     Indictment found and returned in the Superior Court
Department on April 24, 2012.

     A pretrial motion to suppress was heard by C. Jeffrey
Kinder, J.; the case was tried before Daniel A. Ford, J.; and a
motion for a new trial, filed on March 20, 2019, was considered
by Ford, J.


     Alan Jay Black for the defendant.
     Cynthia M. Von Flatern, Assistant District Attorney (Jeremy
C. Bucci, Assistant District Attorney, also present) for the
Commonwealth.

LOWY, J.  During the early hours of February 20, 2012, the victim, Jessica Pripstein, foreshadowed her own death.  In a brief and frantic emergency call, she relayed to the dispatcher that her boyfriend was trying to kill her.  Soon after, officers from the Easthampton police department responding to the call found the victim dead on the bathroom floor of her apartment, her throat cut.  Her boyfriend, the defendant Ryan D. Welch, was on the bedroom floor with his throat cut, but alive.  The defendant subsequently was convicted of murder in the first degree, G. L. c. 265, § 1, on theories of both deliberate premeditation and extreme atrocity or cruelty.  The defendant's direct appeal from that conviction was consolidated with an appeal from the trial judge's denial of his motion for a new trial, and both are now before this court.

On appeal, the defendant argues that the judge who heard his motion to suppress (motion judge) erred in not suppressing several statements that he made while hospitalized and that the trial judge erred in admitting in evidence allegedly unauthenticated text messages as well as prior bad acts evidence and in denying his motion for a new trial without first holding an evidentiary hearing.  Finding no reversible error either in any issue raised by the defendant or in our review under G. L. c. 278, § 33E, we affirm the defendant's conviction and the order denying his motion for a new trial.

Background.  We summarize the facts the jury could have found, reserving certain details for later discussion.

The defendant and the victim had been dating since the fall of 2011.  As 2012 dawned, signs of unease in their relationship were apparent.  Around early February, the victim told a coworker that she had "broken things off" with the defendant.  Then, on February 10, one of the victim's neighbors overheard an argument between the victim and the defendant.  This altercation culminated in the victim slamming a door and yelling at the defendant to leave, which he did.  The victim told her sister on February 18 that she planned on finding a way to end the relationship.

On the evening of February 19, the defendant spent several hours eating and drinking at a local bar.  He explained to a bartender how he had recently both lost his job and been arrested for operating a motor vehicle while under the influence of alcohol (OUI).  In regard to the OUI, the defendant complained that the victim had refused to post his forty dollar bail even though he had just spent seventy dollars on a bouquet of flowers for her for Valentine's Day.  According to the bartender, the defendant appeared to be "aggravated."  The victim later joined the defendant at the bar.  When the bill was due, the defendant did not have enough money to pay it and the

victim paid the difference, appearing to be embarrassed.  Then, at around 11:05 P̲.M̲., the defendant and the victim left the bar.

At 12:04 A̲.M̲. on February 20, the victim called 911, screaming that her boyfriend was trying to kill her.  By the time the call was transferred to a public safety dispatcher, the victim was no longer on the line.  The dispatcher's attempts to call the victim back went unanswered.  Officers arrived at the victim's apartment within three minutes of being dispatched.

After knocking on the apartment's door and receiving no response, an officer peered through a window and noticed blood on the floor.  Officers then forced their way through the front door, which was blocked by a futon.  Once inside the apartment, the officers discovered the victim dead on the bathroom floor with her throat cut and a knife lying on her back.  The defendant was lying nearby on the floor of the bedroom, a knife in his back pocket.  His throat, too, was cut, but he was alive. Bloody sock prints led from the bathroom toward where he lay. The defendant's fingerprints were later found on the futon that had blocked officers' entry through the front door, and a large amount of his blood was found in front of the futon.

The defendant received emergency medical treatment at the scene and then was transported to a nearby hospital, where he underwent surgery.  Autopsy results later confirmed that the victim's throat wound -- which measured two and one-half inches

deep and four inches across -- was inconsistent with suicide.
The defendant subsequently was arrested and charged with the
victim's murder.

Discussion. 1. Motion to suppress. Prior to trial, the
defendant moved to suppress handwritten notes and oral
statements he made to officers while he was hospitalized on
February 21 and February 22, 2012.[1]  The motion judge allowed the
motion as to the statements the defendant made to officers after
he had been arrested on February 22, but otherwise denied it.
On appeal, the defendant makes three arguments pertaining to the
motion to suppress:  (1) that his handwritten notes should have
been suppressed as the product of an illegal search; (2) that
his statements were obtained in violation of his Miranda rights,
see Miranda v. Arizona, 384 U.S. 436, 444-445 (1966); and (3)
that even if these statements were not obtained in violation of
Miranda, they were made involuntarily.[2]

---

[1] The defendant also argued below that the notes were seized
illegally, but he does not renew this argument on appeal.

[2] The defendant further argues that suppression of several
notes to hospital personnel, as well as statements he made to a
nurse at the Hampshire County house of correction, is required
because these communications were provided to officers,
resulting in violations of both the Federal Health Insurance
Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C.
§ 1320d-6, and the Massachusetts Patient's Bill of Rights, G. L.
c. 111, § 70E.  Yet even if the notes are covered by it, "HIPAA
does not provide any private right of action, much less a
suppression remedy."  United States v. Streich, 560 F.3d 926,
935 (9th Cir.) (Kleinfeld, J., concurring), cert. denied, 558

"In general, in reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of his ultimate findings and conclusions of law."  Commonwealth v. Tremblay, 480 Mass. 645, 652 (2018), quoting Commonwealth v. Clarke, 461 Mass. 336, 340 (2012).  As is noted infra, some of the interactions between the officers and the defendant were video recorded.  When a judge's findings are based solely on documentary evidence such as a video recording, we review those findings de novo. Tremblay, supra at 654-655.  "By contrast, findings drawn partly or wholly from testimonial evidence are accorded deference and are not set aside unless clearly erroneous."  Id. at 655.

a.  Facts.  Before considering each of the defendant's arguments in turn, we set out the relevant facts that the motion judge found following an evidentiary hearing.  The facts are supplemented with uncontroverted facts in the record. Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).

---

U.S. 920 (2009).  See, e.g., State v. Yenzer, 40 Kan. App. 2d 710, 712-713 (2008) (HIPAA does not provide suppression remedy); State v. Straehler, 2008 WI App 14, ¶ 13 ("HIPAA does not provide for suppression of the evidence as a remedy for a HIPAA violation").  See also United States v. Zamora, 408 F. Supp. 2d 295, 298 (S.D. Tex. 2006) ("HIPAA was passed to ensure an individual's right to privacy over medical records, it was not intended to be a means for evading prosecution in criminal proceedings").  A breach of G. L. c. 111, § 70, also "does not require exclusion at trial."  Commonwealth v. Senior, 433 Mass. 453, 457 n.5 (2001).

After officers discovered the defendant at the victim's apartment on February 20, he was transported to a nearby hospital. Following surgery on his neck, the defendant was moved to the intensive care unit (ICU) for recovery. Officer Timothy Rogers accompanied the defendant into the ICU but did not have contact with him or communicate with him. The defendant was sedated, as hospital staff believed he might pose a suicide risk.

At around 11:45 A.M. on February 20, Rogers was relieved by Sergeant Bruce Nichol, who entered through the ICU's door, which remained open throughout the officer's stay. Nicol sat against a wall in the defendant's ICU room and observed him, although at no point did Nicol have any contact with him or communicate with him. Over the next twelve hours, the defendant began to regain consciousness and started to communicate with nurses by gesturing. Because the defendant was intubated with breathing and feeding tubes, he was unable to speak. The defendant also was connected to an intravenous line. Nichol observed that the defendant responded appropriately to questions asked by a nurse to assess his mental cognition.

Officer Dennis Scribner relieved Nichol at around 11:40 P.M. on February 20. Scribner mostly monitored the defendant from a position in the hallway outside the defendant's ICU room by looking into the room through its door, which

remained open.  Scribner observed hospital staff members entering and leaving the defendant's room freely.  At around 5:30 A.M. on February 21, a nurse offered Scribner a note written by the defendant that the defendant had given to the nurse.  In the note, the defendant asked if he would recover and be able to speak again, what would happen to him when he left, why there were police officers in his room, and about his girlfriend's condition.  After Scribner read the note, it remained on a table in the hallway outside the defendant's room until one of Scribner's replacements eventually took it into custody.

At roughly 7:45 A.M. on February 21, Scribner was relieved by State police Trooper William McMillan.  At around 9:50 A.M., a nurse invited McMillan to approach the defendant's bedside to answer the defendant's question.  The defendant wrote a note to McMillan that asked about whether he could be evicted because he was behind on rent.  After telling the defendant that he would investigate the situation, McMillan had no more interaction with him during this shift.

State police Trooper John Riley, the lead investigator for the case, arrived at the ICU at around 1:35 P.M. on February 21. Upon entering the defendant's ICU room, Riley explained who he was and that he was there to investigate the circumstances surrounding the defendant's injury.  The defendant was still

unable to speak, so he nodded his head.  After Riley suggested that the defendant might have information that would be helpful, the defendant nodded his head again.  After an unclear gesture by the defendant, Riley asked if the defendant was not yet ready to speak because of his neck injury.  The defendant nodded his head, and Riley left the defendant's room.

Later, a nurse informed Riley that they would be reducing the defendant's pain management medication, fentanyl, and begin administering oxycodone so that the defendant could be moved out of the ICU.  The same nurse also informed Riley that the defendant scored perfectly on a cognitive test.  Shortly afterward, a nurse told Riley that the defendant had given the nurse a note.  The note stated:  "Bleeding from neck then vaguely remember paramedics police?  Before passing out.  Girlfriend unconscious completely.  Don't know why her or me."  Riley left the defendant's room and noticed more notes on a table in the hallway.  Eventually, these notes were taken into custody when a nurse asked another officer whether he wanted them.

At 4 P.M., Riley introduced State police Trooper Gary Darling, who had arrived for a shift, to the defendant.  Riley told the defendant that if he wanted to talk, he should let Darling know.  The defendant responded by writing "one more day in ICU before I can talk."  Riley then departed but returned two

hours later and learned that the medical staff would soon be administering another cognitive test. Riley informed the defendant that if he wanted to speak with the officers, this would be a good time. The defendant responded in writing:

> "We can talk briefly, but I am still terrified about the situation, I also know that you will most likel[y] be considering me a suspect. Until I can speak, I can't have a reasonable conversation with anyone, but believe me, I am trying my best to get this moving. I Just [sic] lost someone very important to me, and I am not sure why."

With the defendant's consent, Riley and Darling videotaped the cognitive test. After the defendant passed the test, Riley interviewed the defendant. While Riley was explaining the interview's purpose, the defendant wrote that he "was at her house," "She was in the bathroom," and "Hygiene/makeup." Riley then asked the defendant to stop and listen, and Riley explained that the defendant was not under arrest and verbally advised the defendant with an incomplete set of Miranda warnings.[3] When asked whether he was familiar with Miranda warnings, the defendant nodded affirmatively. The defendant then wrote: "What I will say for now is that when I opened the bathroom door, I found her in a pool of blood unconscious."

At this point, Riley paused the interview again and explained to the defendant that everything he wrote became part

---

[3] Riley failed to advise the defendant that an attorney would be appointed for him if he could not afford one.

of the record and asked the defendant if he wished to continue. The defendant replied in writing, "I was in a total state of panic[] when I saw her and didn't know what to do.  I think this would be better discussed when I am more capable.  ASAP I want to talk to you all the same."  The defendant added, "It's too serious to discuss right now.  I will accept a lawyer maybe," then crossed out the words "I will accept a lawyer maybe" and wrote, "I will do my best.  I'm sorry."[4] Nearly an hour into the interview, Riley terminated it after the defendant wrote, "At this point I would like to see a lawyer.  You k[n]ow w[h]ere to look now."

Riley returned the following day, February 22, and arrested the defendant at around 10:38 A.M.  This occurred in a non-ICU hospital room where the defendant had been moved sometime during either the evening of February 21 or the early morning of February 22.  Riley explained to the defendant that he would be seizing the defendant's notepad and seeking a warrant to search it.  The defendant replied by writing, "[A]m I somehow waiving my right to an attorney by doing this?"  He added, "[A]t this

---

[4] The defendant also offered the following in notes:  "Is she still alive?  Prior injuries.  Also longstanding psychiatric issues as well, and as I do to some extent"; "I injured myself only.  I couldn't deal with having to be in this position for no fault of my own.  Sorry"; and "With the knife I picked up from next to her.  There is much more to this story beyond that, but both wounds were self inflicted, as far as I can tell."

point, I do reserve my right to remain silent, and the right to any private conversations with medical providers."

b.  Search.  The defendant first argues that officers violated his rights under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights when they read handwritten notes that the defendant passed to both hospital staff and law enforcement while he was recovering in the ICU.[5]  The motion judge found that no search occurred.  We agree.

"The Fourth Amendment and art. 14 protect individuals from unreasonable searches and seizures.  For these constitutional protections to apply, however, the Commonwealth's conduct must constitute a search in the constitutional sense."  Commonwealth v. Almonor, 482 Mass. 35, 40 (2019).  Whether such a search occurred "turns on whether the police conduct has intruded on a constitutionally protected reasonable expectation of privacy."  Commonwealth v. Porter P., 456 Mass. 254, 259 (2010), quoting Commonwealth v. Montanez, 410 Mass. 290, 301 (1991).  "The measure of the defendant's expectation of privacy is (1) whether

---

[5] Although the thrust of the defendant's argument focuses on whether a search of his ICU room occurred, he references in passing multiple hospital rooms in which a search may have occurred.  Insofar as the defendant refers to the non-ICU hospital room where officers arrested him on February 22, we have reviewed the record, and it is at best unclear whether officers even entered this room before arresting the defendant.

the defendant has manifested a subjective expectation of privacy in the object of the search, and (2) whether society is willing to recognize that expectation as reasonable." Porter P., supra, quoting Montanez, supra. "The defendant bears the burden of establishing both elements." Porter P., supra, quoting Montanez, supra.

The motion judge correctly found that the defendant lacked a subjective expectation of privacy in his ICU room. The door to the room remained open throughout the defendant's stay there. Hospital staff entered and left the room freely. Various officers also entered the room to speak with the defendant. Significantly, the defendant never asked the officers to leave. On the contrary, on at least one occasion the defendant appears to have invited an officer to enter the ICU room in order to communicate with him.

The defendant also made no effort to maintain the privacy of the notes themselves until after he was arrested on February 22, 2012, at which point he expressed concern over their legal ramifications. Compare State v. Stott, 171 N.J. 343, 350, 354-358 (2002) (defendant manifested expectation of privacy by hiding pills in hospital room's curtain), with State v. Rheaume, 2005 VT 106, ¶ 9 (no subjective expectation of privacy in part of emergency room where door was open, defendant did not ask officer to leave, and defendant voluntarily communicated with

officer).  Instead, the defendant voluntarily shared the notes with both hospital staff and police to communicate with them. Some of the notes that the defendant gave to hospital staff were left by staff on a table outside the ICU for indeterminate lengths of time.  The defendant also passed notes to officers to communicate with them multiple times.  In this regard, "[o]ur conclusion that [the defendant] had no subjective expectation of privacy is compelled not by a finding that he legally abandoned [the notes] as much as it is by his wholesale failure to manifest any expectation of privacy in the items whatsoever."[6] Commonwealth v. Bly, 448 Mass. 473, 491 (2007).

Although this settles whether a search occurred in this case, we nonetheless discuss whether there is an objectively reasonable expectation of privacy in an ICU room.[7]  When determining whether society is willing to recognize an expectation of privacy as reasonable, we consider the following nonexclusive factors:  (1) the nature of the place searched, (2) whether the defendant owned the place searched, (3) whether the defendant controlled access to the place searched, (4) whether the defendant owned the item seized or inspected, and (5)

---

[6] Because no search in the constitutional sense occurred, we do not consider the defendant's argument that nurses at the hospital operated as agents of law enforcement.

[7] We have never ruled on whether there is an objectively reasonable expectation of privacy in such a space.

whether the defendant took "normal precautions to protect his privacy."  Porter P., 456 Mass. at 259, quoting Commonwealth v. Pina, 406 Mass. 540, 545, cert. denied, 498 U.S. 832 (1990).

Much like in an emergency room, a patient's privacy interests are greatly diminished in the ICU.  See Flannery, First, Do No Harm:  The Use of Covert Video Surveillance to Detect Munchausen Syndrome by Proxy -- An Unethical Means of "Preventing" Child Abuse, 32 U. Mich. J.L. Reform 105, 155 (1998) ("The emergency room, by its very nature, functions as a freely accessible area over which a patient has no control and where his privacy is diminished").  Although "the public at large may not freely access" the ICU, "medical personnel, hospital staff, patients and their families, and emergency workers . . . are, as a matter of course, frequently, and not unexpectedly, moving through the area."  Rheaume, 2005 VT 106, ¶ 10 (detailing lack of reasonable expectation of privacy in curtained off area of emergency room).

Such is true in this case.  Not only did several officers enter the defendant's ICU room unhindered, but a steady stream of hospital personnel also freely flowed through it in order to keep watch over him.  Given the severity of the defendant's injuries, and the potential suicide risk that he posed, the constant attention paid to him by medical staff is unsurprising.  See Flannery, 32 U. Mich. J.L. Reform at 155-156 (whereas "it is

possible for the hospital to respect a patient's request for privacy in the room for a certain time period[,] such a request would be unreasonable in an emergency room setting" where constant attention is inherent to treatment).

As other courts have reasoned, it is difficult, if not impossible, in these conditions for a patient to control access to the area he or she wishes to safeguard.  See, e.g., State v. Cromb, 220 Or. App. 315, 325 (2008) ("social norms do not treat a hospital emergency room, even curtained areas within it, as space in which privacy rights inhere" because of patient's lack of control); Matthews v. Commonwealth, 30 Va. App. 412, 415 (1999) (no reasonable expectation of privacy in separate treatment room in emergency ward); Rheaume, 2005 VT 106, ¶ 10 (patient's lack of control over trauma room renders expectation of privacy unreasonable); Wagner v. Hedrick, 181 W. Va. 482, 487 (1989) (no reasonable expectation of privacy in emergency room in which medical personnel "were constantly moving around" and that was "freely accessible to law enforcement officers"); State v. Thompson, 222 Wis. 2d 179, 193 (1998) (no "reasonable expectation of privacy in either the emergency room or the operating room").  We conclude that even if the defendant had

manifested an expectation of privacy in his ICU room, it would not have been reasonable.[8]

c. Miranda rights. The defendant next argues that statements he made on February 21 while he was in the ICU should have been suppressed, arguing that his Miranda rights were violated when officers did not scrupulously honor his invocation of his right to silence.[9] "[I]n circumstances of custodial interrogation, Miranda requires that the defendant 'be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires'" (footnote omitted). Clarke, 461 Mass. at 341-342, quoting Miranda, 384 U.S. at 479.

---

[8] This does not mean that donning an ICU gown necessarily strips from a defendant every privacy interest he or she had before being admitted. A defendant may, for example, have a reasonable expectation of privacy in items stored within the possessions he or she brings into the ICU. See, e.g., People v. Wright, 804 P.2d 866, 868 (Co. 1991) (defendant had "reasonable expectation of privacy in the contents of her purse" that police searched while she was being treated at hospital); State v. Loewen, 97 Wash. 2d 562, 564, 569 (1982) (warrantless search of defendant's tote bag left at nurse's station at hospital unreasonable). However, as is clear from the discussion supra, that is not this case.

[9] The defendant also appears to argue that statements he made the next day, February 22, were obtained in violation of his Miranda rights. Because the motion judge suppressed the statements made after the defendant was arrested, it is unclear to which other statements the defendant refers.

Before determining whether the defendant invoked his right to silence, however, we must examine whether he was in custody at the time and thus whether Miranda warnings were necessary. See Commonwealth v. Jung, 420 Mass. 675, 689 (1995), quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977) ("Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody'"). We determine that he was not in custody.

An individual is in custody when "a reasonable person in the suspect's shoes would experience the environment in which the interrogation took place as coercive." Commonwealth v. Larkin, 429 Mass. 426, 432 (1999). To determine whether the environment in which an interrogation was coercive, we examine four nonexclusive factors, no one of which is dispositive:

> "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest."

Commonwealth v. Tejada, 484 Mass. 1, 8, cert. denied, 141 S. Ct. 441 (2020), quoting Commonwealth v. Groome, 435 Mass. 201, 211-212 (2001). See Commonwealth v. Bryant, 390 Mass. 729, 737 (1984) ("Rarely is any single factor conclusive"). "Where a

defendant challenges the admission of a statement allegedly resulting from custodial interrogation, the defendant bears the initial burden of proving custody." Commonwealth v. Newson, 471 Mass. 222, 229 (2015).

A reasonable person in the defendant's position would not have experienced the environment at issue as coercive. Officers questioned the defendant in his ICU room, not an interrogation room. See Commonwealth v. McGrail, 80 Mass. App. Ct. 339, 346 n.12 (2011) (hospital cubicle where defendant was treated for injuries and where officers and medical personnel entered and departed multiple times not custodial). Cf. Commonwealth v. Mejia, 461 Mass. 384, 390 (2012) (conference room in hospital where defendant was treated for injuries "neutral location" and noncustodial). The motion judge found that "health care providers freely came and went through an open door" of the defendant's room, signifying that officers could not dominate the setting. See United States v. Infante, 701 F.3d 386, 397 (1st Cir. 2012), cert. denied, 570 U.S. 911 (2013) (defendant not in custody where "hospital staff came and went freely during the course of the interviews, suggesting that the officers were not in a position to dominate [the setting] as they are, for example, an interrogation room at a jailhouse" [quotation and citation omitted]). In short, although a person may be in custody without having set foot into a police station, see,

e.g., Commonwealth v. Damiano, 422 Mass. 10, 13 (1996), the place of interrogation here was not coercive.

Other factors, too, demonstrate that the defendant was not in custody on February 21. Although the defendant wrote that he believed he was a suspect, officers did not communicate this to him at the time. See Mejia, 461 Mass. at 390 (Miranda warnings unnecessary where although defendant "knew that police were seeking an arrest warrant for the defendant and admitted on cross-examination that there was probable cause to arrest, these suspicions were never communicated to the defendant"). See also Commonwealth v. Morse, 427 Mass. 117, 124 (1998), quoting Stansbury v. California, 511 U.S. 318, 324 (1994) ("an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the Miranda custody inquiry"). The officers' questioning was also not aggressive. On the contrary, each interview was accompanied with inquiries by officers to the defendant asking whether he wished to talk to them. Compare Commonwealth v. Cawthron, 479 Mass. 612, 622 (2018), quoting Commonwealth v. Coleman, 49 Mass. App. Ct. 150, 155 (2000) ("interrogation was 'aggressive and persistent' where 'defendant's denials were scorned and overridden,' 'substance of what was said was harsh and intended by the questioner to be so'"). Nor did the officers exploit the defendant's condition

by seeking to extend his stay in the hospital unnecessarily. See United States v. Martin, 781 F.2d 671, 673 (9th Cir. 1985) ("There are no facts to indicate law enforcement officials . . . did anything to extend [defendant's] hospital stay and treatment"). Indeed, it was the defendant who initiated most of the conversations by passing notes either to hospital staff or to police officers.

In response, the defendant stresses that he was connected to machines and intravenous lines, rendering his freedom severely curtailed. It is true that the defendant's medical condition ensured that he could not leave the room at will. At the same time, the defendant, not law enforcement, created the situation in which he found himself. Cf. United States v. Jamison, 509 F.3d 623, 632 (4th Cir. 2007) (Miranda warnings unnecessary where defendant "was primarily restrained not by the might of the police, but by his self-inflicted gunshot wound, the medical exigencies it created, and the investigation he initiated"). Given the seriousness of the defendant's injuries, a "reasonable person would have understood that he was being held at the hospital by medical personnel for medical purposes," not by law enforcement for investigatory purposes. McGrail, 80 Mass. App. Ct. at 346.

More importantly, officers expressly told the defendant that he could ask them to leave at any time. This is analogous

to cases dealing with the Miranda rights of prisoners:  the defendant's ability to leave the room was obviously constrained, but his ability to change who was in it was not.  See, e.g., Larkin, 429 Mass. at 434 ("rather than asking whether a prisoner was free to leave the facility, courts have asked whether he is subject to some restraint in addition to those normally imposed on him by virtue of his status as an inmate").  In other words, had the defendant clearly told the officers to leave, and had they refused, the analysis would be different.  Because he did not, we discern no error.

Even assuming that the defendant was in custody at the time, the defendant's statement -- a written note stating "one more day in ICU before I can talk" -- did not properly invoke his right to remain silent on February 21.  An invocation of the right must be "unambiguously" stated such that, objectively, "a reasonable police officer in the circumstances would understand the statement to be an invocation of the Miranda right." Clarke, 461 Mass. at 342 (quotation and citations omitted). Although establishing an invocation is less demanding under art. 12 of the Massachusetts Declaration of Rights than under the Federal standard set out in Berghuis v. Thompkins, 560 U.S. 370, 381 (2010), statements indicating a willingness to speak with officers in the future are not sufficient to invoke the right. See Clarke, supra at 348 (defendant's statement, "Not right now,

in a minute. I need to figure some things out," did not invoke right to be silent). The defendant's statement falls within this category.

d. Voluntariness. The defendant also contends that the statements he made while hospitalized were obtained involuntarily. "Where a defendant makes statements to the police while not in custody, we focus solely on the question whether his statements were voluntary" (quotation and citation omitted). Commonwealth v. Libby, 472 Mass. 37, 48 (2015). "[T]he Commonwealth must prove beyond a reasonable doubt that in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was [not] overborne, but rather that the statement was the result of a free and voluntary act" (quotations and citation omitted). Commonwealth v. Baye, 462 Mass. 246, 256 (2012). Because of the pain and confusion that he felt, as well as the effects of the medications with which he was being treated, the defendant argues that the Commonwealth cannot carry its burden. We disagree.

"Only voluntary confessions or admissions are admissible regardless of whether they are made to police or civilians." Commonwealth v. Kolenovic, 478 Mass. 189, 198 (2017). To determine whether a statement was voluntarily made, we consider several factors, including (1) the "conduct of the defendant,"

(2) "the defendant's age, education, intelligence and emotional stability," (3) the defendant's "physical and mental condition," and (4) "the details of the interrogation, including the recitation of Miranda warnings."  Commonwealth v. Bell, 473 Mass. 131, 142 (2015), cert. denied, 136 S. Ct. 2467 (2016), quoting Commonwealth v. Hilton, 450 Mass. 173, 177 (2007).

Although statements "attributable in large measure" to debilitating conditions are "not the product of a rational intellect or free will," the mere influence of drugs or alcohol on the defendant will not transform otherwise voluntary statements into involuntary ones.  Bell, 473 Mass. at 141, quoting Commonwealth v. Allen, 395 Mass. 448, 455 (1985).  Additionally, "[t]hat a defendant is suffering from a serious and painful injury, such as a bullet or knife wound, does not necessarily preclude a statement being made voluntarily."  Bell, supra.  Nor does "[t]he fact that a defendant may have been in a disturbed emotional state, or even suicidal, . . . automatically make statements involuntary."  Commonwealth v. Richards, 485 Mass. 896, 910 (2020), quoting Commonwealth v. LeBlanc, 433 Mass. 549, 555 (2001).

Review of the record confirms that the defendant's statements were voluntary.  Despite being hospitalized with a serious medical condition, having just undergone surgery, and being treated with pain medication, the defendant understood and

was responsive to questions by hospital staff and police officers. See Bell, 473 Mass. at 142 (despite suffering from serious injury, experiencing pain, and consuming intoxicants, defendant's coherent responses to medical providers and police officers rendered statements voluntary); Commonwealth v. Stroyny, 435 Mass. 635, 646-647 (2002) (defendant's statement to hospital staff and law enforcement made while in pain from slashed wrists was voluntary).

In particular, the defendant was awake and alert and passed the cognitive tests administered by hospital staff.[10] See, e.g., Commonwealth v. Clark, 432 Mass. 1, 12-13 (2000) ("alert and oriented" defendant's statements to police voluntary despite recovering from gunshot wound to his head and arm); Allen, 395 Mass. at 457 ("rational and alert" defendant's statements to nurse after brain surgery were voluntary). Cf. Commonwealth v. Rivera, 482 Mass. 259, 267 (2019) (defendant who was "not demonstrating confusion" voluntarily waived Miranda rights despite being medicated to treat pain from attempted suicide). The defendant could manipulate his surroundings to make himself more comfortable and could communicate his needs by writing

---

[10] The motion judge also reviewed video recordings of the delirium test and the questioning, as well as credited expert testimony by a psychiatrist that the defendant's conduct and his medical records supported finding that his statements were voluntary.

notes to hospital staff. Indeed, the defendant not only appeared to be aware of his immediate surroundings, but also inquired into the victim's medical condition and his own financial circumstances. The defendant even had the presence of mind to provide exculpatory statements, such as claiming that the victim's wounds were self-inflicted. See Commonwealth v. Sneed, 440 Mass. 216, 222 (2003) (defendant's effort to exculpate herself supported finding her statements to be voluntary).

Considering his OUI arrest the week before, the defendant "had some prior experience with law enforcement officers and the court system." Libby, 472 Mass. at 49. Even without this familiarity, the motion judge found that the officers' questioning was neither psychologically nor physically coercive. Officers made no improper promises or inducements. See Commonwealth v. Colon, 483 Mass. 378, 390 (2019) (absence of either express or implied assurances by officers why, in part, defendant's statements were voluntary); LeBlanc, 433 Mass. at 555-556 (same). Furthermore, officers repeatedly told the defendant that he could ask them to leave. Considering the totality of the circumstances, we hold that the defendant's statements were voluntary.

2. Evidentiary issues. In addition to the suppression issues, the defendant challenges several evidentiary matters

from the trial.  "We review a judge's evidentiary rulings for an abuse of discretion."  Commonwealth v. Andre, 484 Mass. 403, 414 (2020).

a.  Text messages.  At trial, the Commonwealth elicited testimony from State police Trooper David Swan regarding text message exchanges between the cell phones associated with the defendant and the victim.  Swan read aloud text messages that highlighted, among other things, the defendant's problems with alcohol, money, his job, and tensions and arguments between the defendant and the victim.  These text messages were exchanged between February 10 and February 18, 2012, the week leading up to the killing.  The defendant argues that the text messages were not authenticated, and thus the trial judge erred in allowing them in evidence.  We disagree.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Mass. G. Evid. § 901(a) (2021).  "Where the Commonwealth seeks to introduce evidence of cell phone communications, 'the judge [is] required to determine whether the evidence was sufficient for a reasonable jury to find by a preponderance of the evidence that the [individual] authored' the communications."  Commonwealth v. Webster, 480

Mass. 161, 170 (2018), quoting Commonwealth v. Purdy, 459 Mass. 442, 447 (2011).

As with other types of communication, the authentication of text messages "may be accomplished by way of direct or circumstantial evidence, including its [a]ppearance, contents, substance, internal patterns, or other distinctive characteristics" (quotations and citation omitted). Commonwealth v. Lopez, 485 Mass. 471, 477 (2020). See Mass. G. Evid. § 901(b)(4). Other "confirming circumstances" that may authenticate text messages include acknowledgement that the defendant uses the cell phone, acknowledged ownership by a defendant of the cell phone containing the messages, and whether the defendant knows or supplies the passwords protecting the cell phone. See Purdy, 459 Mass. at 450-451. See also Mass. G. Evid. § 901(b)(11).

Abundant confirming circumstances are present here. Focusing first on the cell phones from which the text messages were sent and received, each was registered to the defendant's and the victim's e-mail accounts, respectively. Cf. Lopez, 485 Mass. at 478 (fact that defendant lived with victim who owned cell phone from which text messages were sent confirming circumstance of defendant's authorship of messages). Both were password protected. Indeed, Swan testified that he had to use specialized software to break into the cell phones. Compare

Commonwealth v. Williams, 456 Mass. 857, 869 (2010) (messages sent from social media webpage unauthenticated where "no testimony . . . regarding how secure such a Web page is, who can access a Myspace Web page, [or] whether codes are needed for such access").  Finally, officers found the cell phones with the defendant and the victim on the night of the killing.

Testimony about the text messages' contents further linked them to the defendant.  See Purdy, 459 Mass. at 450-451 (e-mail account's secure nature combined with its contents authenticated messages).  The messages were replete with details of the defendant's and the victim's lives, including the tensions within their relationship, aspects of their living arrangements, and the suspension of the defendant's driver's license from his OUI charge.  See Commonwealth v. Alden, 93 Mass. App. Ct. 438, 441 (2018), cert. denied, 139 S. Ct. 2010 (2019) ("In addition to the content of the text messages, [victim's] prior relationship with the defendant and her use of the telephone number to communicate with him over a significant period of time provided the necessary link").

Various text messages from the victim's cell phone to the defendant's cell phone, for example, referenced the defendant's distinctive nickname.  Circumstances beyond the text messages tie this name to the defendant.  Specifically, one message from the defendant describes how he intended to deliver the victim

flowers on Valentine's Day.  The defendant later remarked to a bartender how he had bought the victim flowers for the holiday. When officers arrived at the victim's apartment on February 20, they found flowers with a card inscribed with the defendant's distinctive nickname.  Cf. Commonwealth v. Johnson, 470 Mass. 300, 317-318 (2014) (e-mail messages authenticated "given the long-standing relationship between [the joint venturer] and the defendants, the defendants' prior use of the e-mail address at the time of the scheme, and the referencing of the harassing acts in the e-mails," which were independently observed).  See Commonwealth v. Nardi, 452 Mass. 379, 396 (2008), quoting Commonwealth v. LaCorte, 373 Mass. 700, 704 (1977) (authentication may be established through testimony "that circumstances exist which imply that the thing is what its proponent represents it to be").  Taking all these confirming circumstances together, the evidence authenticating the text messages was overwhelming.

Against this conclusion, the defendant suggests that the text messages could have been authored by someone else, pointing to the lack of evidence about how regularly he may have needed to enter his password to use the cell phone, that there was no evidence about who else may have had access to the password, and that the card on the flowers may have been authored by an unidentified party.  Maybe that is so.  The defendant's claim,

however, that another person may have authored either the text messages or the card is relevant to their weight, not their admissibility. Purdy, 459 Mass. at 451. The Commonwealth presented more than an ample foundation for the judge to determine that a reasonable jury could find by a preponderance of the evidence that the defendant authored the text messages.

b. Prior bad acts. The defendant next argues that the trial judge erred in allowing in evidence certain prior bad acts evidence. "We have long held that '[e]vidence of prior bad acts is not admissible to show that the defendant has a criminal propensity or is of bad character.'" Andre, 484 Mass. at 414, quoting Commonwealth v. Otsuki, 411 Mass. 218, 236 (1991). See Mass. G. Evid. § 404(b)(1). "However, such evidence is admissible when offered for another purpose, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or pattern of operation, so long as its probative value for that purpose is not outweighed by its prejudicial effect." Commonwealth v. Hall, 485 Mass. 145, 163 (2020), citing Commonwealth v. Crayton, 470 Mass. 228, 249 (2014). "[T]he application of [limiting] instructions ordinarily renders any potentially prejudicial evidence harmless." Crayton, supra at 251, quoting Commonwealth v. Donahue, 430 Mass. 710, 718 (2000).

i. OUI charge. At trial, the Commonwealth introduced evidence that the defendant had been arrested for OUI the week

before the killing, arguing that the victim's unwillingness to post bail was a motivating factor in the defendant's decision to kill her.  On appeal, the defendant argues that any relationship between the OUI and an alleged motive is slight, and that its introduction served only to tarnish his reputation.  Because the defendant preserved the issue, we review for prejudicial error.  See Commonwealth v. McDonagh, 480 Mass. 131, 142 (2018).  We find none.

Evidence concerning the OUI charge was relevant to show the deterioration of the defendant and the victim's relationship and thus provide a motive for why he killed her.  See, e.g., Commonwealth v. Mason, 485 Mass. 520, 532 (2020) (prior bad acts evidence "provided context for the defendant's hostility toward" victim); Commonwealth v. Sharpe, 454 Mass. 135, 144-145 (2009) (prior bad acts evidence "relevant to show the existence of a hostile relationship"); Commonwealth v. Mendes, 441 Mass. 459, 464-465 (2004) ("Evidence of the hostile relationship between the defendant and his wife was not offered as improper propensity evidence, as the defendant contends, but also as evidence of his motive to kill her").  At trial, the officer who arrested the defendant for the OUI testified that, during the arrest, the defendant explained that he had just been in a fight with his girlfriend.  Text messages between the victim and the defendant, as well as witness testimony, established that he had

recently been fired from his job, was financially strapped, and was increasingly anxious. For example, one witness testified that on the evening leading up to the killing, the defendant was aggravated by the victim's refusal to post his bail for the OUI charge.

Whatever prejudicial effect this evidence had on the defendant was slight when considered in the context of the rest of the evidence that the Commonwealth presented and the crime for which the defendant was on trial. In any event, the judge instructed the jury not to consider the OUI as evidence of the defendant's propensity to commit the crime charged in the indictment. See Commonwealth v. Bryant, 482 Mass. 731, 737 (2019) (jury presumed to follow judge's limiting instructions concerning prior bad act evidence). Therefore, the judge did not abuse his discretion.

ii. Text messages about a work-related dispute. The Commonwealth also presented text messages between the defendant and the victim concerning a dispute that the defendant had with former coworkers, arguing that the exchange was relevant to prove motive. The dispute, which led to the defendant being fired, involved a physical altercation between the defendant and his coworkers. On appeal, the defendant contends that the text messages about the dispute bore only a "very tenuous" connection to the crime with which he was charged. Because the defendant

did not preserve this issue, we review "for a substantial likelihood of a miscarriage of justice."[11]  Commonwealth v. Upton, 484 Mass. 155, 160 (2020).  A brief description of these exchanges demonstrates that their link to the crime was far from tenuous.

At the time of the killing, the defendant recently had been fired from his job at a local restaurant.  The victim also worked there and continued to do so after the defendant had been terminated.  Through a series of text messages to the victim in the days leading up to the killing, the defendant ranted about perceived wrongs done to him by former coworkers.  The victim's answers varied from seeking to change the subject to trying to calm the defendant down.  Yet in response to the victim's attempts to extricate herself from the exchanges, the defendant turned his ire on her, alleging that the victim was like his former coworkers:  aloof to his struggles.  Several instances of this pattern occur in the exchanges.[12]  After further analogous

---

[11] The defendant claims that the issue is preserved because of the motion in limine he filed to exclude the text messages. However, the only motion concerning the text messages filed by the defendant dealt with the authentication issue and did not raise the prior bad acts issue.  A different motion in limine did object to prior bad act evidence, but that referenced only the OUI testimony.

[12] For example, in response to the victim telling the defendant to "calm down," the defendant wrote:  "You don't care about me either apparently.  That makes it easier for me to just say fuck you too.  You'd be better off working at something you

back-and-forth exchanges, the victim appears to have grown weary not only of the dialogue, but also of the defendant, telling him, "Whatever.  Evacuate my house immediately."  As the defendant continued to complain about work-related problems, the victim repeated that she wanted him to leave her apartment.

Although the impetus for these exchanges is a work-related dispute, their connection to the defendant and the victim's relationship is not "tenuous."  Like the OUI, the text messages demonstrated motive.  Throughout the exchanges, the defendant connected his complaints about his former coworkers and employer to the victim, eventually blaming the latter for his misfortunes.  In doing so, the text messages showcased the defendant's palpable anger with the victim.  Whatever prejudicial effect the text messages had did not outweigh their significant probative value.  We discern no error.

3.  Motion for a new trial.  After being convicted, the defendant moved for a new trial, claiming that his trial counsel had been ineffective.  Specifically, the defendant argued that he and his trial counsel had been unable to communicate

---

want to do."  The defendant quickly followed up this message with another one stating:  "I have less problem destroying [the defendant's former employer] now."  In another instance, after the victim told the defendant to leave her apartment, he wrote to her:  "Talk to me when either you or [a former coworker] grows a conscience.  You would have done what I'm doing now long ago if you were me.  I would bet my life on it."

effectively.  The judge, who had also been the trial judge, denied the motion without holding an evidentiary hearing.  On appeal, the defendant argues that the judge erred in denying the defendant's motion without holding an evidentiary hearing.

A judge may rule on a motion for a new trial, without an evidentiary hearing, if no substantial issue is raised in the motion or affidavits.  Upton, 484 Mass. at 161.  "In determining whether a substantial issue exists, 'a judge considers the seriousness of the issues raised and the adequacy of the defendant's showing on those issues.'"  Id. at 162, quoting Commonwealth v. Barry, 481 Mass. 388, 401, cert. denied, 140 S. Ct. 51 (2019).  In terms of the first prong, there is no dispute.  "A claim of ineffective assistance of counsel . . . readily qualifies as a serious issue."  Commonwealth v. Lys, 481 Mass. 1, 6 (2018), quoting Commonwealth v. Denis, 442 Mass. 617, 629 (2004).

Turning next to the adequacy of the showing, "the defendant's submissions 'need not prove the [motion's] factual premise . . . but they must contain sufficient credible information to cast doubt on the issue.'"  Upton, 484 Mass. at 162, quoting Commonwealth v. Goodreau, 442 Mass. 341, 348 (2004).  "Where, as here, the motion judge is also the trial judge, he may use his 'knowledge and evaluation of the evidence at trial in determining whether to decide the motion for a new

trial without an evidentiary hearing.'" Commonwealth v. Riley, 467 Mass. 799, 826 (2014), quoting Commonwealth v. Wallis, 440 Mass. 589, 596 (2003). "We review a judge's decision to deny a motion for a new trial without holding an evidentiary hearing 'for a significant error of law or other abuse of discretion'" (citation omitted). Upton, supra.

The judge did not abuse his discretion. Because the judge also had presided over the trial, he was able to observe how the defendant and his trial counsel interacted. What he observed indicates that any communication issues were likely of the defendant's own making.[13] For example, during a status conference, the defendant's trial counsel informed the judge that he had just learned, by receipt of a package from the Office of Bar Counsel, that the defendant had filed a complaint against him. Trial counsel was unaware whether the defendant wanted to continue being represented by him. When asked by the judge about this issue, the defendant expressed his interest in continuing to be represented because, since he had submitted his complaint, he had witnessed the effectiveness of his counsel. The defendant then opted to withdraw the complaint,

---

[13] By the conclusion of his trial, the defendant had been represented by two attorneys (one as full trial counsel and another initially as standby counsel and then also as full trial counsel), each attorney had moved to withdraw, and the defendant had moved pro se to dismiss his counsel.

acknowledging that his own stubbornness likely factored into the friction between him and his attorney.

Although the defendant stated in an affidavit in support of his motion for a new trial that he had felt anxious and fearful toward his trial counsel, the judge did not credit these assertions. Nor, for that matter, did the judge have to credit them. See Commonwealth v. Marrero, 459 Mass. 235, 241 (2011), quoting Commonwealth v. Lucien, 440 Mass. 658, 672-673 (2004) ("The judge was entitled to reject summarily any claim supported only by the defendant's self-serving affidavits, and infer from his own observation of the defendant and counsel at trial that they were conferring over precisely the matter the defendant now claims was never discussed"). We thus discern no error.

4. Review under G. L. c. 278, § 33E. Finally, the defendant asks this court to exercise its discretion under G. L. c. 278, § 33E, either to "order a new trial" or to "direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence." To this end, the defendant argues that a combination of mental illnesses, substance use disorders, and trauma indicate that the killing reflected spontaneity, not premeditation.[14] We disagree.

---

[14] Specifically, the defendant has a history of obsessive compulsive disorder, posttraumatic stress disorder, dysthymic disorder, alcohol dependence, and narcissistic, borderline, and passive aggressive personality traits. He has a history of

The defendant's mental illnesses, although serious, do not demonstrate that he was "driven by [his] mental condition" alone to kill the victim. Commonwealth v. Colleran, 452 Mass. 417, 434 (2008). See Commonwealth v. Concepcion, 487 Mass. 77, 95 (2021) ("Mental illness alone is generally insufficient to support a verdict reduction under G. L. c. 278, § 33E"). On the contrary, rather than a "bolt from the blue," the victim's death was preceded by growing hostilities between her and the defendant. Compare Colleran, supra at 433 ("There appears to have been no hostile relationship between the defendant and the victim"); Commonwealth v. Dalton, 385 Mass. 190, 196-197 (1982) (verdict reduced to murder in second degree where defendant and victim had good relationship and no motive was apparent). These tensions culminated in a frantic emergency telephone call from the victim followed by her throat being slashed and her death. Amidst these developments, a jury could have found that the defendant formed the intent to cause the victim's death. See Commonwealth v. Robinson, 482 Mass. 741, 746 (2019), quoting Commonwealth v. Chipman, 418 Mass. 262, 269 (1994) ("The law recognizes that a plan to murder may be formed within a few seconds").

---

suicidal ideations and attempts to commit suicide, and had been prescribed four medications to help manage his mental health. The defendant also reported a history of homelessness and being the victim of two rapes that went unprosecuted.

We have reviewed the entire record of this case pursuant to our responsibilities under G. L. c. 278, § 33E. We conclude that there is no basis for reducing the defendant's sentence on the murder conviction or ordering a new trial.

<u>Judgment affirmed</u>.

<u>Order denying motion for a new trial affirmed</u>.